McDANIELD v HEMKER

Docket No. 263150. Submitted September 7, 2005, at Grand Rapids. Decided September 27, 2005, at 9:05 a.m. Leave to appeal sought.

Mable L. and Gregory A. McDanield brought an action in the Mecosta Circuit Court against John T. and John L. Hemker, seeking noneconomic tort damages for injuries sustained by Mable McDanield when a van she was driving was hit by a truck driven by John T. Hemker and owned by John L. Hemker. Mrs. McDanield's injuries were to the scapular area and the cervical spine, caused pain when she moved, caused her to give up recreational activities, and were diagnosed by her doctors to be permanent. The court, Robert A. Benson, J., granted summary disposition for the defendants, ruling that Mrs. McDanield's residual impairment of a body function is a self-imposed restriction based on real or perceived pain and that she therefore did not suffer the serious impairment of body function required by the no-fault act, MCL 500.3135, for tort liability. The plaintiffs appealed.

The Court of Appeals *held*:

Under the totality of the circumstances, Mrs. McDanield suffered the necessary threshold injury constituting a serious impairment of body function under MCL 500.3135 because the plaintiffs established the existence of an objectively manifested impairment of an important body function that affected and affects Mrs. McDanield's general ability to lead her normal life.

1. Mrs. McDanield suffered a serious impairment of body function. Evidence submitted by the plaintiff indicated that Mrs. McDanield sustained cervical damage that is permanent, painful, and restricts the movement of her back, shoulders, neck, and head.

2. The impairment affects Mrs. McDanield's general ability to lead her normal life. She continues to work as a bus driver and food server, but with substantial pain and physical limitations that require the assistance of coworkers. She has abandoned recreational activities, has curtailed housework, is moodier, and has decreased intimate contact with her husband.

3. In *Kreiner v Fischer*, 471 Mich 109, 133 n 17 (2004), the Supreme Court said that self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish the residual impairment. However, in this case, the pain-based restrictions placed on Mrs. McDanield were imposed by a physician who identified a physiological basis for the pain and determined that the restrictions were necessary.

Reversed and remanded for further proceedings.

*Walz & Warba, P.C.* (by *Mark J. Warba*), for the plaintiffs.

*John A. Lydick* for the defendants.

Before: SMOLENSKI, P.J., and MURPHY and DAVIS, JJ.

MURPHY, J. Plaintiffs appeal as of right the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(10) in this action that arose when plaintiff Mable Lorraine McDanield (hereinafter McDanield) was injured in a motor vehicle accident, and in which action we are again called upon to discern the language of *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004), in determining whether McDanield suffered the necessary threshold injury constituting a serious impairment of body function pursuant to MCL 500.3135.[1] We hold that, under the totality of the circumstances, McDanield suffered a serious impairment of body function as a matter of law under MCL 500.3135, where plaintiffs established the existence of an objectively manifested impairment of an important body function that affected and affects McDanield's general ability to lead her normal life. Accordingly, we reverse and remand.

[1] Plaintiff Gregory A. McDanield alleged a derivative claim predicated on loss of consortium.

On September 30, 2000, defendant John Tyler Hemker, while operating a pickup truck owned by his father, defendant John Lawrence Hemker, drove the vehicle into an intersection where it collided with McDanield's van. McDanield was operating the van and two of her children were passengers in the vehicle. Plaintiffs alleged that the younger Hemker failed to stop or yield the right-of-way at the intersection. According to her deposition testimony, McDanield, traveling 50 to 55 miles an hour consistently with the speed limit, did not have the opportunity to take evasive action before the crash; she did slam on her brakes, but to no avail. At the point of impact, McDanield's head flew violently forward as she gripped the steering wheel. The van's airbag deployed, striking her in the face and immediately throwing her head backward against the seat's headrest. Then, after spinning around and skidding out of control, McDanield's van momentarily tipped up onto the driver's side wheels, with the passenger side wheels losing contact with the pavement. During this time, McDanield hit her head on the side window, and thereafter, her head and neck were jerked back and sideways when the van finally came back down on all four wheels. McDanield experienced neck pain and difficulty breathing at the accident scene. Her children suffered some bumps, scrapes, and bruises, but apparently no serious injuries. Because of the pain, McDanield remained in the van until emergency medical personnel arrived and assisted her out of the vehicle. They placed her on a backboard, put a cervical collar around her neck, and transported her to a nearby medical facility. McDanield did not believe that Hemker stopped at the intersection, and she indicated that he was traveling at a high rate of speed. The record reveals that John Tyler Hemker subsequently pleaded guilty of the offense of operating a motor vehicle while visibly impaired by alcohol.

Plaintiffs filed suit in August 2003, seeking noneco-
nomic damages resulting from alleged head, neck, back,
and shoulder injuries suffered by McDanield in the
accident. Defendants filed a motion for summary dispo-
sition pursuant to MCR 2.116(C)(10), arguing that
McDanield's injuries did not affect her general ability to
lead her normal life, and, therefore, she did not incur a
serious impairment of body function as defined in MCL
500.3135(7). The trial court granted defendants' mo-
tion, finding that McDanield "does not have a residual
impairment as a matter of law because her impairment
is a self-imposed restriction based on real or perceived
pain," which, according to the court, did not suffice as
stated in *Kreiner, supra* at 133 n 17.[2] Plaintiffs appeal as
of right.

This Court reviews de novo a trial court's ruling to
either grant or deny a motion for summary disposition.
*Id.* at 129. Questions of statutory interpretation are
likewise reviewed de novo. *Id.* Further, questions of law
in general are reviewed de novo. See *Nat'l Wildlife
Federation v Cleveland Cliffs Iron Co,* 471 Mich 608,
612; 684 NW2d 800 (2004).

MCR 2.116(C)(10) provides for summary disposition
where there is no genuine issue regarding any material
fact, and the moving party is entitled to judgment or
partial judgment as a matter of law. A trial court may
grant a motion for summary disposition under MCR
2.116(C)(10) if the pleadings, affidavits, and other docu-

---

[2] The trial court stated that there was probably enough evidence to go
to trial on the issue of the impairment affecting McDanield's general
ability to lead her normal life because of the evidence showing that she
had given up most of her recreational activities and some of her
gardening, that she had lost time from work, and that her relationship
with her husband was negatively affected. However, the court felt that it
was compelled by *Kreiner* to dismiss the action solely on the conclusion
that self-imposed restrictions were involved.

mentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996), citing MCR 2.116(G)(4). Initially, the moving party has the burden of supporting its position with documentary evidence, and, if so supported, the burden then shifts to the opposing party to establish the existence of a genuine issue of disputed fact. *Quinto, supra* at 362; see also MCR 2.116(G)(3) and (4). "Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in [the] pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Quinto, supra* at 362. Where the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. *Id.* at 363. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp,* 469 Mich 177, 183; 665 NW2d 468 (2003) (citations omitted).

Under the no-fault act, a plaintiff may recover noneconomic losses only where the plaintiff has suffered "death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). The issue whether a person has suffered a serious impairment of body function is a question of law for the trial court to decide where the court finds that there is no factual dispute concerning the nature and extent of the person's injuries or where there is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impair-

ment of body function. MCL 500.3135(2)(a). MCL 500.3135(7) defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." The effect of an impairment on the course of a plaintiff's entire normal life must be considered. *Kreiner, supra* at 131. "Although some aspects of a plaintiff's entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's 'general ability' to lead his normal life has not been affected and he does not meet the 'serious impairment of body function' threshold." *Id.* The *Kreiner* majority further stated:

> In determining whether the course of plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely *"any* effect" on the plaintiff's life is insufficient because a de minimus [sic] effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

> The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves. For example, that the duration of the impairment is

short does not necessarily preclude a finding of a "serious impairment of body function." On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function." Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life." [*Id.* at 132-134 (emphasis in original).]

With these *Kreiner* principles in mind, we first turn to the extensive documentary evidence presented in the case at bar. McDanield's deposition testimony reveals that at the time of the accident, she was employed as a school bus driver and food service person for the Reed City school district. McDanield worked eight hours a day for the school district; approximately four hours in food service and four hours driving a bus. She testified that she was initially off work because of her injuries for approximately six weeks. McDanield's doctor, Dr. John H. Kilgore, restricted her from working during this period because of the pain, which was mainly in her neck and shoulder.[3] Kilgore's diagnosis was "traumatic cervical myositis and costochondritis." McDanield then returned to work; however, her pain began to increase in early 2001, and by April 2001, according to her deposition testimony, she was again restricted from working. Kilgore's affidavit indicates that McDanield returned to his office in February 2001 complaining of increased neck pain and tingling in her right trapezius muscle. The affidavit further avers that McDanield

---

[3] Dr. Kilgore's affidavit is consistent with McDanield's testimony regarding his decision to restrict her from working during this period. The affidavit indicates that on November 16, 2000, he allowed her to go back to work. Kilgore is a doctor of osteopathic medicine and maintains a private family practice in Reed City.

again saw Kilgore on April 12, 2001, at which time she complained of increased neck pain, plus numbness and tingling radiating into her right arm and hand. Kilgore noted that "[t]he trapezius muscle was still extremely tender, and she had an olive-sized area of muscle spasm." Electrodiagnostic testing was performed, and the test results were normal. However, magnetic resonance imaging (MRI) was also performed, and it revealed injuries to the cervical spine according to Kilgore, who also opined that McDanield sustained the cervical injuries as a result of the accident.

Dr. Kilgore referred McDanield to Dr. Girish Juneja,[4] who first saw McDanield in June of 2001. From that point forward, Juneja treated McDanield for her accident-related injuries, although Kilgore remained her primary care physician. Juneja, who executed an affidavit that was submitted to the trial court, diagnosed McDanield with chronic neck pain, whiplash syndrome, neck and parascapular myofascial pain, and cervicogenic headaches. Juneja indicated, on the basis of an MRI, that McDanield's neck showed foraminal stenosis exacerbated by bulged discs at two different levels. An examination of McDanield revealed persisting trigger points in her neck and parascapular area, along with reproducible headaches with compression of the nerve in the cervical area. Juneja treated McDanield with nerve blocks, muscle relaxers, pain medication, and physical therapy. Juneja avers that McDanield was suffering often from headaches and neck pain.

McDanield did not return to work until October 2001, when she started driving a school bus again. In November 2001, she also resumed her food service duties and was thus working full-time. McDanield's

---

[4] Dr. Juneja is board-certified in physical medicine and rehabilitation with a subspecialty board certificate in pain management.

return to work was approved or allowed by Juneja. Juneja indicated that by October 2001, McDanield was reporting significant improvement from the injections and medications. But in December 2001, McDanield returned to Juneja, complaining of increased head and neck pain. Juneja avers that, on physical examination, McDanield had "localized tenderness over the occipital area bilaterally and over the paravertebral area in the lower cervical region at the C6 and C7 levels."

Throughout 2002, McDanield continued being treated by Juneja for persistent head and neck pain, and physical examinations repeatedly reflected tenderness over the occipital area, in the neck and parascapular musculature. Juneja suspected some ligamentous injury of the neck that was not healing. Into 2003, McDanield continued seeing Juneja because of persistent pain. Based on a February 2003 digital motion x-ray, Juneja's affidavit provided the following impressions:

12. . . . * Damage to the posterior longitudinal ligament, indicated by an anterolisthesis at C3 on C4, C4 on C5, and C6 on C7 and widening of the posterior intervertebral disc spaces at C3 on C4, C4 on C5 and C6 on C7.

* Possible damage to the anterior longitudinal ligament, indicated by a retrolisthesis and anterior widening of the intervertebral disc spaces at C6 on C7.

* Damage to the alar and accessory ligaments, indicated by the overhang of the lateral mass of C1 bilaterally.

13. Ligamentous injuries are painful, progressive, and permanent in nature.

Juneja opined that "the movements of Mrs. McDanield's head and neck during the course of the motor vehicle incident that occurred on September 30, 2000, exerted sufficient force on Mrs. McDanield's

cervical spine to cause ligament injuries that were detected in the Motion x-ray." Juneja further averred:

18. As the direct result of the trauma sustained in the motor vehicle incident, and in Mrs. McDanield's fact situation:

A. Both the posterior and anterior longitudinal ligaments, which hold the vertebrae in place in the cervical area, were damaged and/or torn,

B. Thereby allowing the vertebrae to move out of their normal alignment;

C. This slippage of the vertebrae [the "listhesis"] causes the intervertebral discs to be pushed or bulged out.

D. In addition, the vertebrae do not articulate properly with one another, causing an abnormal wearing of the uncovertebral joints, and

E. The misalignment also causes the narrowing of the neural foramina.

19. When ligaments are stretched or torn, they do not heal nor go back to their original shape.

Instead, injured ligaments allow for abnormal movement of the vertebrae [which is constant, and occurs every time Mrs. McDanield moves her head and neck], and this in turn causes inflammation of all of the soft tissues in the cervical area [which is a very limited and confined space, allowing no room for such abnormal movement or inflammation]; the inflammation itself causes even more pressure on the soft tissues [in turn causing an increase in symptoms, complaints of pain, and limitation on range of motion and activities].

Juneja informed plaintiffs that McDanield's neck pain and headaches "are going to be more of a permanent injury." Juneja continued McDanield's physical therapy and pain medication. Of some significance here, Juneja stated that he "continued Mrs. McDanield on her pain medication and home exercise program, instructing her to adjust her activities based on her pain

level." McDanield continued seeing Juneja because of pain, and Juneja kept her on a regimen of physical therapy, pain medication, and muscle relaxers. We note that throughout Juneja's affidavit, it is conveyed that McDanield had difficulty sleeping at night because of pain arising out of the positioning of her neck.

Into 2004, Juneja indicated that McDanield was seen regularly for pain and continued on pain medication, muscle relaxers, and physical therapy. After noting that there is no surgery to repair ligament damage or to realign the vertebrae and that the ligamentous injuries are most likely a permanent condition, Juneja concluded his affidavit by averring:

> 25. Mrs. McDanield will continue to experience headache and neck pain for a long period of time, and she has to adapt her life accordingly; there are certain activities which she may not be able to do, or if she does, she probably will have pain and discomfort.
>
> She can continue to take medication to control her headache and neck pain, continue with things such as cervical traction and stretching exercises at home, or undergo repeat nerve blocks for any flare-ups of intense neck pain; beyond that, there is nothing more that would afford Mrs. McDanield any relief from her ongoing symptoms and complaints.

Returning to McDanield's deposition testimony, she testified that her pain has increased over time and that fellow employees have assisted her in the performance of her work duties when the pain becomes overwhelming. Various head, neck, back, and shoulder movements necessitated by her employment cause pain. McDanield further testified:

> I was pretty active recreationally, especially raising three boys. And I have—some of the things—I'm—I try to do, and the pain is too severe, or I suffer too bad after, so I don't do it. And that's—I mean, a lot of things. The bike

> riding. And we love to go camping a lot, because I'm off for the summers. And playing baseball and basketball and— you name it, I did it. And I don't do those things like I did.

* * *

> We don't do the camping. That's too difficult. I loved volleyball, can't do that much. Bowling. I mean, there were many things that we did that I haven't been doing. Even gardening, I don't do as much as I used to. That's too difficult. Even my housework. I've cut back. I think I've only pushed the vacuum twice in the last four years. I have to make the kids do it.

McDanield also testified in her deposition that she no longer cooks as often, explaining that "[a] lot of times when I get home, by the time I'm home at 5:00, . . . I'm in a lot of pain, so . . . I go lay down when I get home so the guys will cook dinner." Plaintiff Gregory McDanield testified at his deposition that his wife is moodier and more easily aggravated and that there has been a decrease in the frequency of intimate contact.

On review de novo, we hold that, in light of the documentary evidence recited above, which is not disputed by defendants, McDanield suffered and suffers a serious impairment of body function as a matter of law pursuant to MCL 500.3135, and, more particularly, we conclude that plaintiffs established that the impairment affected McDanield's general ability to lead her normal life. Defendants have not asserted that McDanield did not suffer an objectively manifested impairment of an important body function. Additionally, the trial court specifically found that McDanield suffered an objectively manifested impairment of an important body function and that defendants conceded this point. Moreover, the evidence, recited above, clearly establishes that McDanield suffered an objectively manifested impairment of an important body function.

Therefore, the statutory threshold has been satisfied with respect to all elements.

On review of the entire record, McDanield's injuries resulted in her being out of work approximately six to seven months,[5] needing assistance from coworkers while currently employed because of the pain, having to forgo recreational activities once enjoyed, significantly curbing her household chores, limiting her gardening activities, interfering with her sleep habits, decreasing intimacy with her husband, and has resulted in years of visits to doctors for tests and treatments, which treatments included the use of pain medications, nerve blocks, muscle relaxers, and physical therapy, with a prognosis that she will have to continue such a regimen, in whole or in part, because she will most likely have pain for the remainder of her life. There can be no legitimate or honest dispute that the course or trajectory of McDanield's normal life has been inextricably affected. See *Kreiner, supra* at 131. Comparing McDanield's life before and after the accident is similar to comparing day to night; all aspects of her life have been significantly affected with no meaningful relief in sight. According to Dr. Juneja, McDanield will have a life of pain and discomfort and will need to adapt accordingly. We note that McDanield was only 40 years old at the time of the accident.

---

[5] This does not include the three months of summer vacation during the summer of 2001 that, had McDanield held a year-round position, would have been an additional period of no employment because of the injuries. The record reflects that McDanield continues to work while experiencing pain. We are troubled by the fact that some individuals injured in a motor vehicle accident, while incurring pain or disabilities that might reasonably preclude continued employment, nonetheless continue to work, enduring the pain and discomfort because of a strong work ethic and pride or because of absolute economic necessity, yet, by doing so, damage their ability to show a change in their life following the accident.

Viewed in the context of the five factors listed in *Kreiner*, which are not exclusive or dispositive by themselves, the nature of the impairment relates to cervical damage resulting in pain in and limited use of McDanield's back, shoulders, neck, and head, which come into play in almost any activity or movement. *Kreiner, supra* at 133 (factor a). The type of treatment is extensive and involves pain medications, nerve blocks, muscle relaxers, and physical therapy, and, regarding the length of treatment, it is ongoing and will continue into the foreseeable future. *Id.* at 133 (factor b). With respect to the duration of the impairment, Juneja's affidavit indicates that it will in all likelihood be permanent and not subject to surgical correction, and the prognosis for eventual recovery is poor. *Id.* (factors c and e). We have intentionally left factor d, "the extent of any residual impairment," for last because it is directly tied to the footnote that appears to have been the sole basis for the trial court's resolution of this case, and which has created much confusion and contention in the bench and bar of this state. *Id.* at 133 n 17. We, hopefully, will clarify the meaning of the footnote in a manner that is consistent with the intention of our Supreme Court in drafting the language contained therein.

Directly after reciting factor d, the *Kreiner* Court placed footnote 17, and the footnote provides, "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." Read in the context of the placement of the footnote, the footnote can be construed as providing, "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish [the extent of any residual impairment]." The necessary corollary of this language

is that physician-imposed restrictions, based on real or perceived pain, can establish the extent of a residual impairment.

First, we think it necessary to define what is being spoken about when the Court refers to "residual" impairment. The term "residual" means "pertaining to or constituting a remainder; remaining; leftover" or "something that remains to discomfort or disable a person following an illness, injury, operation, or the like[.]" *Random House Webster's College Dictionary* (2001). The impairment here can be best described as the inability of McDanield, in many situations, to position or maneuver her upper body, extremities, and neck and head in such a way that avoids pain from ligamentous injuries of the cervical spine, thereby interfering with or precluding various activities in McDanield's life. This claimed impairment is continuing or ongoing and remains to discomfort McDanield following the injury; therefore, it qualifies as a "residual" impairment. Consistent with the *Kreiner* footnote, the extent of this residual impairment cannot be proven by way of self-imposed restrictions based on real or perceived pain. Stated differently, McDanield cannot establish the extent of her residual impairment by merely claiming that she has restricted herself from engaging in activities or making certain movements because she experiences pain. We note that a self-imposed restriction *not* based on real or perceived pain can be considered. If a plaintiff restricts himself or herself from doing something because the plaintiff is physically incapable of doing so, but not on the basis of pain, the restriction should be subject to consideration in determining the extent of any residual impairment. For example, if a right-handed person's right arm is in a full cast, and that person claims to be restricted from playing sports that involve throwing a ball, the self-imposed restriction would suffice.

We think it evident that our Supreme Court crafted footnote 17 in *Kreiner, in the context of establishing the extent of any residual impairment,* because the nature of pain tends to be subjective and therefore inherently questionable. While there may exist a medically identifiable or physiological basis for the pain, self-imposed restrictions because of pain, in and of themselves, fail because there is no medical expertise supporting the restrictions, which expertise would, in all likelihood, take into consideration the source of the pain before restrictions are imposed. That said, if there are physician-imposed restrictions based on real or perceived pain, footnote 17 does not require that the doctor offer a medically identifiable or physiological basis for imposing the restrictions.

Viewing the documentary evidence presented in this case, we find, contrary to the trial court's findings, that there were physician-imposed restrictions in place based on pain. Dr. Juneja stated that he "continued Mrs. McDanield on her pain medication and home exercise program, instructing her to adjust her activities based on her pain level." Although Juneja's instructions rely to some degree on McDanield's pain tolerance and her own assertions of pain, the instructions reflect a physician's belief that McDanield should indeed restrict herself on the basis of pain, and Juneja has directed her to do so. It is apparent to us that in many situations where there are physician-imposed restrictions based on pain, the instructions or limitations provided by the physician will be fairly open-ended, making reference to or being dependent on the level of pain experienced by the injured party when performing a particular task. To assist the bench and bar in addressing fact patterns in which it may be difficult to ascertain whether restrictions are truly physician-imposed, in cases where there is evidence that the

physician has pinpointed a physiological basis for the pain or believes that the patient is truly suffering pain, such evidence, while not conclusive, lends support to a conclusion that instructions by the physician constitute physician-imposed restrictions.[6] Here, it is clear from the documentary evidence, which is not challenged by defendants, that there is a medically identifiable or physiological basis for McDanield's pain and that Juneja accepted that McDanield was suffering pain. Furthermore, evidence regarding restrictions is not the only way to establish the extent of any residual impairment. Juneja's expert statements and opinions themselves regarding McDanield's medical condition and the likelihood that her condition is permanent can be utilized to show the extent of the residual impairment.

Next, it is important to take notice of the fact that footnote 17 is not a general proposition enunciated by our Supreme Court, but rather it is tied directly to one factor, factor d, and the Court emphasized that the enumerated factors are "not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves." *Kreiner, supra* at 133-134. Accordingly, simply because there may be self-imposed restrictions based on pain does not mean that a plaintiff has not established a threshold injury. A trial court must examine all the evidence presented; consider, if relevant, all the *Kreiner* factors; and view "the totality of the circumstances" in determining whether an impairment has affected "the person's general ability to lead his or her normal life" as required by MCL 500.3135(7). *Kreiner, supra* at 132, 134.

---

[6] We reiterate, however, that footnote 17 in *Kreiner* does not require that the doctor offer a medically identifiable or physiological basis for imposing restrictions based on pain.

Here, under the totality of the circumstances, McDanield suffered the necessary threshold injury constituting a serious impairment of body function under MCL 500.3135, where plaintiffs established the existence of an objectively manifested impairment of an important body function that affected and affects McDanield's general ability to lead her normal life.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.