# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT ORWIG and REBECCA ORWIG,

        Plaintiffs-Appellants,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

        Defendant-Appellee.

UNPUBLISHED
November 16, 2017

No. 333603
Monroe Circuit Court
LC No. 15-137368-CK

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

In this action to recover benefits for underinsured motorist coverage under an automobile insurance policy issued by defendant, Farm Bureau General Insurance Company of Michigan, plaintiffs Robert Orwig and Rebecca Orwig appeal by delayed leave granted the trial court's order granting defendant's motion for summary disposition under MCR 2.116(C)(10). We reverse.

On February 4, 2012, plaintiff Robert Orwig[1] was injured in an automobile accident while working as a police officer[2] for the city of Toledo, Ohio. After being hit by a drunk driver who ran a stop sign,[3] plaintiff suffered a posterior left hip dislocation, a left acetabular (hip socket) fracture, a left knee injury, a right ankle sprain, a laceration of his head, a closed head injury, a left rib strain, and a variety of contusions and abrasions. Following the accident, among other physicians, plaintiff treated with orthopedic surgeon Dr. Gregory M. Georgiadis for the injuries to his left knee and his hip and participated in physical therapy. Dr. Georgiadis also referred plaintiff to a vascular specialist, Dr. Bernardo Martinez, after plaintiff began to complain

---

[1] Robert Orwig's spouse, plaintiff Rebecca Orwig, asserted a claim for loss of consortium. The singular term "plaintiff" is used in this opinion to refer only to Robert Orwig.

[2] Plaintiff is a member of the SWAT team. Plaintiff is also a veteran of the United States Army and also served in the National Guard for 20 years.

[3] After being hit by Jared Harris, who had a blood alcohol level (BAC) of .23, the police vehicle that plaintiff was sitting in "projected through the intersection and into a tree on the other side of the intersection."

of discoloration in his feet and his feet turning cold. Plaintiff was then diagnosed with a vascular disorder. Following the accident, plaintiff was off work for about three months, and after being released from the hospital plaintiff initially required a wheelchair for mobility, and then used a walker, crutches and a cane. Plaintiff returned to full-time active duty with the Toledo police on the SWAT team when he returned to work, but he did not fully participate in SWAT activities for about eight months. For example, before resuming his normal activities, plaintiff refrained from wearing heavy bullet proof vests and participating in raids, which often involved the use of a 50-pound door-breaching ram, as he was concerned about further injury to his hip.

As relevant to this appeal, defendant filed a motion for summary disposition, arguing that plaintiff's entitlement to benefits depended on whether plaintiff could establish a threshold injury under MCL 500.3135(1), which provides for tort liability for noneconomic loss caused by a person's ownership, maintenance, or use of a motor vehicle "only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." In this case, plaintiff's complaint alleged only that plaintiff had sustained a serious impairment of body function. Defendant argued that plaintiff could not establish a serious impairment of body function because (1) plaintiff had never identified an important body function that was impaired, and (2) there was no evidence that any injury plaintiff received in the accident affected his general ability to lead his normal life. The trial court granted defendant's motion, ruling that genuine issues of material fact did not exist with regard to whether plaintiff had incurred a serious impairment of body function. MCL 500.5135(1), (5).

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). A motion for summary disposition under MCR 2.116(C)(10) "tests whether there is factual support for a claim." *Mich Mut Ins Co v Dowell*, 204 Mich App 81, 85; 514 NW2d 185 (1994). In deciding such a motion, "a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). If the record evidence "fails to establish a genuine issue regarding any material fact, the moving party is entitled to a judgment as a matter of law." *Id*. (Citations omitted.)

At issue in this case is whether genuine issues of material fact exist concerning whether plaintiff suffered a serious impairment of body function. A serious impairment of body function is defined as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5).[4] In *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010), the Michigan Supreme Court held that "three prongs . . . are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." "[A]n 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions."

---

[4] While the parties may dispute the nature and extent of plaintiff's injuries, the dispute is "not material to the determination whether [plaintiff] has suffered a serious impairment of body function[,]" and therefore we may decide the issue as a matter of law. MCL 500.3135(2)(a)(*ii*).

*Id*. at 196. "[W]hen considering an 'impairment,' the focus 'is not on the injuries themselves, but how the injuries affected a particular body function.' " *Id*. at 197 (citation omitted). With regard to the second prong, a body function will be considered "important" depending on its "value," "significance," or "consequence" to the injured person. *Id*. at 19. The third prong requires that the impairment of an important body function "affect[ ] the person's general ability to lead his or her normal life." *Id*. at 200. This is a subjective inquiry and "requires a comparison of the plaintiff's life before and after the accident." *Id*. at 202.

In this case, plaintiff has presented evidence to satisfy the first prong of the *McCormick* analysis. Specifically, the record evidence reflects that following the accident, plaintiff suffered several "objectively manifested impairment[s] of body function[s]" MCL 500.3135(5), including a posterior left hip dislocation, a left acetabular (hip socket) fracture, left knee injury, a right ankle sprain, a laceration of his head, a closed head injury, a left rib strain, and a variety of contusions and abrasions. While defendant contends that much of these issues resolved in the time following the accident, the record reflects that within six months of defendant moving for summary disposition with regard to the tort threshold of MCL 500.3135(1), plaintiff was still grappling with a hypersympathetic vascular constrictive disorder, which according to Dr. Martinez, resulted from the motor vehicle accident.[5] Moreover, the record evidence, by way of Dr. Georgiadis's notes, also confirms that as of December 3, 2015, plaintiff experienced post traumatic arthritis, in his "left hip after a left hip dislocation associated acetabular fracture."

Plaintiff also presented record evidence to satisfy the second prong of the analysis set forth in *McCormick*, where the "objectively manifested impairment[s] of body function[s]," were "important." *McCormick*, 487 Mich at 198. In *McCormick*, the Michigan Supreme Court consulted two dictionaries to define the word "important[:]"

> Whether a body function has great "value," "significance," or "consequence" will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life.

Plaintiff testified that he has experienced impaired body functions that are important to him. *McCormick*, 487 Mich at 218. Specifically, following the accident, plaintiff's ability to engage in athletic races and competitions, a key part of his life, was greatly impacted, and he was no longer able to participate in recreational activities of bowling and riding his motorcycle. Accordingly, we are satisfied that plaintiff presented evidence to meet the second prong of MCL 500.3135(5).

The record evidence also supports plaintiff's contention that his ability to lead his normal life was affected by the objectively manifested impairment of an important body function. MCL 500.3135(5). As the *McCormick* Court instructed, "[d]etermining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison

---

[5] Dr. Martinez also attributed this disorder to a gunshot wound to his leg that plaintiff incurred in April 2011.

of the plaintiff's life before and after the incident." *McCormick*, 487 Mich at 202. As the *McCormick* Court further ruled, MCL 500.3135(5) requires only that a person's "general ability to lead his or her normal life has been *affected*, not destroyed."

> Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected. [*McCormick*, 487 Mich at 202.]

The *McCormick* Court also cautioned that the statute requires only that "some of the person's ability to live his or her normal manner of living [be affected]." *Id*. at 202. The Court also observed that "there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*. at 202-203. In this case, there is ample record evidence to establish that the impairments at issue "affected [plaintiff's] general ability to lead his normal life" where his capacity to engage in his normal, pre-incident manner of living was influenced. *Id*. at 218. For example, plaintiff testified that he experiences significant pain from the injury to his hip when he is engaged in running, an activity that he has been participating in since high school. Further, plaintiff has to use sports cream to "limit or minimize" the pain.[6] Pain from plaintiff's hip injury will also "flare up" when he has to wear a heavy vest for extended periods of time as part of his police work. With regard to his vascular disorder, plaintiff testified that after about four or five minutes of sitting in a motor vehicle, his feet will begin to turn blue and "will be cold to the touch[,]" and will remain that way until plaintiff begins to get up and move around to get his circulation moving again. Before the accident, plaintiff and his wife would participate in a bi-monthly bowling league, but he has had to refrain from this activity because he is unsure of whether his hip will withstand the activity. Plaintiff gave this same testimony with regard to riding his motorcycle, because he is concerned that his hip will not "hold up" while riding his 700 pound motorcycle. Additionally, before the accident, plaintiff would participate in 10 athletic races in a year, but after the accident he has only participated in "maybe a couple a year." Also, plaintiff now uses ice packs regularly and takes over-the-counter pain relievers after his physical activity. According to plaintiff, the pain from his hip has caused him to slow down while participating in athletic races:

> Right, I mean I may run—and I'm not saying this when I'm running, but like before the accident I would run a 5K at like 7:10, 7:15 pace whereas[,] if I were to run a half a marathon it might be an 8 minute pace.

> But now since the accident a 5K which used to be like a 7:10 pace is now like a –between an 8 and 8 ½ minute pace, so almost a whole minute a mile.

As the trial court observed, we recognize that the record evidence also reflects that plaintiff resumed a rigorous physically active lifestyle following the motor vehicle accident and

---

[6] According to plaintiff in his December 11, 2015 affidavit, "I run because I enjoy it and because it relaxes me and relieves stress."

that he continues to do so.[7]  However, the record evidence also confirms that plaintiff was very physically active before the motor vehicle accident, and that the impairments he incurred following the motor vehicle accident greatly influenced the manner in which he was able to conduct the active physical regimen that was a part of his regular life activity before the motor vehicle accident.  Therefore, the record evidence, viewed in the light most favorable to plaintiff, establishes that plaintiff's individual "capacity to live his pre-incident manner of living was affected, and the third prong of [MCL 500.3135(5)] is satisfied."  *McCormick*, 487 Mich at 219.[8]

Reversed and remanded for proceedings consistent with this opinion.  Plaintiffs, as the prevailing parties, may tax costs pursuant to MCR 7.219.  We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

---

[7] In his October 19, 2015 deposition, Dr. Bernardo D. Martinez testified that he encouraged plaintiff to continue his active lifestyle, and his "level of training[,]" as well as his "cardiovascular conditioning."  Plaintiff also averred in his December 11, 2015 affidavit that Dr. Martinez was aware of his active fitness regimen and encouraged plaintiff to "remain active and continue to exercise."

[8] In the trial court and in this Court, defendant points to our Court's decision in *McDanield v Hemker*, 268 Mich App 269; 707 NW2d 211 (2005), arguing that self-imposed restrictions following an accident will not suffice to meet the tort threshold of serious impairment of a body function.  The trial court also relied on *McDanield* in rendering its decision.  However, in *McDanield*, the Court relied on factors set forth in *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004) in concluding that self-imposed restrictions resulting from pain will not establish a residual impairment.  *McDanield*, 268 Mich App at 282-284.  However, the *McCormick* Court overruled *Kreiner* and expressly rejected the factors from *Kreiner* that the *McDanield* Court relied on.  *McCormick*, 487 Mich at 184, 207-209.  Therefore, the principle of law set forth in *McDanield* is not persuasive in our analysis.