MINTER v CITY OF GRAND RAPIDS

Docket No. 273017. Submitted March 13, 2007, at Grand Rapids. Decided April 12, 2007, at 9:00 a.m. Leave to appeal sought.

Dorothy Minter brought an action in the Kent Circuit Court against the city of Grand Rapids and Grand Rapids police officer John E. Wetzel, seeking noneconomic tort damages for serious impairment of body function and permanent serious disfigurement in connection with injuries she sustained when she was struck by Wetzel's patrol car. The plaintiff alleged that she sustained a broken toe, a cervical strain, a closed head injury, and a laceration above her right eyebrow that left a 13-millimeter scar. The court, Paul J. Sullivan, J., granted summary disposition for the defendants, ruling that no genuine issue of material fact existed and the defendants were entitled to judgment as a matter of law because the plaintiff failed to establish serious impairment of body function or permanent serious disfigurement. The plaintiff appealed.

The Court of Appeals *held*:

1. The trial court properly granted summary disposition with respect to the plaintiff's broken toe and cervical strain. After determining that there was no factual dispute concerning the nature and extent of these injuries, the trial court correctly determined that any impairments caused by them did not affect the plaintiff's ability to lead her normal pre-accident life, given that the injuries healed in a matter of weeks and the plaintiff no longer experienced any ongoing effects of either injury.

2. The trial court should not have granted summary disposition with respect to the plaintiff's closed head injury. Under MCL 500.3135(2)(a), the issue whether an injured person has suffered serious impairment of body function involving a closed head injury is a question of law if there is no factual dispute concerning the nature and extent of the person's injury or, if there is a factual dispute concerning the nature and extent of the injury, the dispute is not material to the determination whether the person has suffered serious impairment of body function. The statute also provides that a question of fact concerning a closed head injury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed head injuries testifies under

oath that there may be a serious neurological injury. In this case, an automatic jury question was not created in the absence of sworn testimony by the physician who diagnosed a mild traumatic injury to the plaintiff's brain. However, the absence of such testimony only precludes the plaintiff from taking advantage of the automatic route to a jury question; it does not necessarily preclude her from establishing a jury question by other means. The plaintiff alleged, and the defendants disputed, that dizziness, confusion, and pain gave rise to impairments that affect her ability to lead her pre-accident normal life. Thus, a question of fact for the jury exists with respect to the closed head injury.

3. The trial court should not have granted summary disposition with respect to the plaintiff's scar. The parties do not dispute the existence and permanence of the scar, which must, by definition, be a disfigurement. At issue between the parties is the seriousness of that disfigurement. The plaintiff contends that the scar causes her a considerable amount of embarrassment and discomfort, as well as an inability to express emotions and communicate nonverbally with the affected eyebrow. The parties' factual dispute regarding the scar is sufficient to give rise to a jury question and preclude summary disposition.

Affirmed in part, reversed in part, and remanded for further proceedings.

O'CONNELL, P.J., concurring, wrote separately to elaborate on the plaintiff's scars. A genuine factual issue regarding their severity is indicated by photographs showing that the noticeable and irregularly shaped scars sharply contrast with the plaintiff's skin tone, and by a physician's testimony that corrective surgery is necessary. A jury should decide if the primary scar is a permanent serious disfigurement.

MURRAY, J., concurring in part and dissenting in part, agreed with the majority's decision to affirm the trial court's grant of summary disposition to the defendants with respect to the plaintiff's broken toe and cervical strain. He also agreed that, even though the plaintiff did not offer testimony by a physician regarding her alleged closed head injury, she can still seek to establish a claim of serious impairment of body function. However, Judge MURRAY disagreed with the majority's decision to reverse the trial court's grant of summary disposition to the defendants with regard to the plaintiff's closed head injury and scar. There was no dispute in the evidence regarding the nature and extent of that injury and scar, and the trial court properly decided as a matter of law whether the closed head injury and scar respectively constituted a serious impairment of body function and a serious perma-

nent disfigurement. The trial court correctly ruled that the plaintiff's closed head injury did not affect her general ability to lead her normal pre-accident life, given that the injuries (except for the scar) lasted no more than four months and led to no physician-imposed restrictions on the plaintiff's activities, and that the scar did not constitute permanent serious disfigurement, given that the scar is only slightly lighter in color that the plaintiff's skin tone and a plaintiff's embarrassment and sensitivity about his or her appearance are a subjective reaction to a condition that must be objectively judged and that do not, as in this case, always create a question of fact.

1. INSURANCE — NO-FAULT — SERIOUS IMPAIRMENTS OF BODY FUNCTIONS — CLOSED HEAD INJURIES — JURY QUESTIONS.

Sworn testimony by a physician who regularly diagnoses or treats closed head injuries that a plaintiff injured in an automobile accident and seeking noneconomic tort damages may have a serious neurological injury automatically creates a factual question for a jury concerning whether the plaintiff has suffered a serious impairment of body function; the absence of such testimony, however, does not preclude the plaintiff from establishing a jury question by other means (MCL 500.3135[2][a]).

2. INSURANCE — NO-FAULT — PERMANENT SERIOUS DISFIGUREMENTS.

A plaintiff injured in an automobile accident and seeking noneconomic tort damages for permanent serious disfigurement must establish that the disfigurement is severe; subjective factors such as the emotional effect of the disfigurement on the plaintiff must be judged in an objective manner (MCL 500.3135).

*Bernstein & Bernstein* (by *Mark M. Grayell*) for the plaintiff.

*Catherine M. Mish*, Assistant City Attorney, for the defendants.

Before: O'CONNELL, P.J., and MURRAY and DAVIS, JJ.

DAVIS, J. Plaintiff appeals as of right an order granting summary disposition to defendants pursuant to MCR 2.116(C)(10). The trial court determined that plaintiff did not suffer either a serious impairment of

body function or a permanent serious disfigurement, so her claim was barred by the no-fault insurance act, MCL 500.3101 *et seq*. We affirm in part, reverse in part, and remand.

Defendant Wetzel is a police officer employed by defendant city of Grand Rapids. On August 15, 2002, at approximately 5:00 p.m., he was in a police cruiser responding to a request for assistance from another officer. He slowed down to make a left turn despite his view being blocked by an illegally parked vehicle. When he turned, he struck plaintiff, who was legally crossing the street. Wetzel was traveling approximately 15 to 20 miles an hour at the time of the collision, and he does not dispute that the accident was his fault.

Plaintiff was 67 years old at the time; she had a bad back and could not lift things, but she was otherwise self-sufficient and leading a normal life without physical issues. As a result of the accident, she sustained a broken toe, a cervical strain,[1] a closed head injury, and a laceration above her right eyebrow. Plaintiff took Vicodin and wore a special soft shoe for a week to a month, and, by the time of her deposition, her toe had completely healed. Her cervical strain required her to wear a soft collar for two weeks and refrain from heavy lifting, bending, squatting, and housework for three months; she still experienced stiffness six months later, but again, by the time of her deposition, the strain was completely resolved.

Although the laceration has healed, plaintiff still has a scar above her right eyebrow. Apparently, the scar can be reduced but not completely removed. Plaintiff finds the scar embarrassing, and it itches, occasionally becomes numb, and hurts when touched. Plaintiff also

---

[1] This strain involved strained muscles in the side of the neck and shoulder, in the area of the upper portion of the spine. .

contends that the scar prevents her from moving her right eyebrow in a "normal" manner. However, the scar is only approximately 13 millimeters (slightly longer than half an inch) long. Plaintiff was diagnosed with a "mild traumatic brain injury" by her treating allopathic physician as a result of her closed head injury. She reported frequent headaches, occasional dizziness, memory problems, and insomnia. She was prescribed physical therapy, speech therapy, and language therapy, but she was not restricted from any daily activities. Although she completed her treatment and has fewer headaches, she contends that she has more dizziness, as well as confusion and blurred vision. She contends that she is no longer able to walk, dance, or even cross the street comfortably.

The trial court determined that plaintiff did not suffer for any "prolonged" period from her injuries, and her injuries did not affect her ability to live her normal pre-accident life. The trial court also determined that plaintiff's scar was "relatively small" and not "readily noticeable." Therefore, the trial court concluded that plaintiff had not suffered a "serious impairment of a bodily function" or a "permanent serious disfigurement." The trial court therefore granted summary disposition to defendants, and plaintiff now appeals as of right.

A grant or denial of summary disposition is reviewed de novo to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, we consider all the evidence submitted by the parties in the light most favorable to the nonmoving party and grant summary disposition only where the evidence fails to establish a

genuine issue regarding any material fact. *Maiden,
supra* at 120. We likewise review de novo questions of
statutory construction, with the primary goal of giving
effect to the intent of the Legislature. *Weakland v
Toledo Engineering Co, Inc,* 467 Mich 344, 347; 656
NW2d 175 (2003), amended on other grounds 468 Mich
1216 (2003). The general purpose of the no-fault insur-
ance act was to partially abolish tort remedies for
injuries sustained in motor vehicle accidents and to
substitute first-party insurance benefits in the place of
tort remedies. *Stephens v Dixon,* 449 Mich 531, 541; 536
NW2d 755 (1995). Under the no-fault insurance act, a
person remains subject to tort liability for noneconomic
loss caused by his or her ownership, maintenance, or
use of a motor vehicle only if the injured person suffered
death, serious impairment of body function, or perma-
nent serious disfigurement. *Id.* at 539; MCL
500.3135(1).

The standard for assessing whether a plaintiff has
sustained a serious impairment of body function is set
forth in *Kreiner v Fischer,* 471 Mich 109; 683 NW2d 611
(2004). This is a threshold standard, requiring "an
objectively manifested impairment" that affects the
plaintiff's "general ability to lead his or her normal
life." MCL 500.3135(7). This analysis is highly plaintiff-
specific: for example, a plaintiff who can no longer
throw a baseball at 95 miles an hour might or might not
be "seriously impaired" depending on whether the
plaintiff was a professional baseball pitcher or "an
accountant who likes to play catch with his son every
once in a while." *Kreiner, supra* at 134 n 19. The overall
course of the specific plaintiff's "entire normal life"
before and after the accident must be compared. *Id.* at
130-131. Our Supreme Court has provided a list of
factors that "may be of assistance," but emphasized
that they are not exclusive. *Id.* at 133-134. The only

caveat is that residual impairment cannot be established on the basis of a plaintiff's self-imposed limitations "based on real or perceived pain." *Id.* at 133 n 17; *McDanield v Hemker*, 268 Mich App 269, 282-283; 707 NW2d 211 (2005). The first step of this analysis requires the court to "determine that there is no factual dispute concerning the nature and extent of the person's injuries," or that the dispute is immaterial. *Kreiner, supra* at 131. The court must then determine whether an important body function has been impaired, whether any such impairment is objectively manifested, and, if so, whether the impairment affects the plaintiff's general ability to lead his or her normal life. *Id.*

We agree with the trial court that plaintiff's broken toe and cervical strain do not meet this standard. At most, she had to wear a soft shoe for a month and a soft collar for two weeks, and she had to refrain from activities that she was mostly or completely unable to do anyway. Plaintiff does not experience any ongoing effects of either injury. The trial court properly granted summary disposition regarding plaintiff's broken toe and cervical strain.

It appears to us that the trial court may have concluded that plaintiff was legally unable to establish a serious impairment of body function in the form of a closed head injury based on a diagnosis by her treating allopathic physician (who regularly treats closed head injuries) of "mild traumatic brain injury." If so, this is simply incorrect. The relevant statute, MCL 500.3135(2)(a), provides as follows:

> The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(i) There is no factual dispute concerning the nature and extent of the person's injuries.

(ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement. However, for a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury.

If a properly qualified doctor testifies "that there may be a serious neurological injury," there would *automatically* be a jury question. That did not occur here. "The language of § 3135 does not indicate, however, that the closed-head injury exception provides the exclusive manner in which a plaintiff who has suffered a closed-head injury may establish a factual dispute precluding summary disposition." *Churchman v Rickerson*, 240 Mich App 223, 232; 611 NW2d 333 (2000). Therefore, the lack of medical testimony on point only precludes plaintiff from taking advantage of the automatic route to a jury issue, it does *not* necessarily preclude her from establishing a question for the jury by other means.

The parties do not dispute the bare fact that plaintiff sustained a closed head injury. She was 67 years old at the time. The headaches of which she complains are irrelevant under *Kreiner*. However, she also asserts that she suffers from dizziness, confusion, and blurred vision; as a result, she has a reduced ability to locomote independently, to perform routine tasks necessary to life, and to engage in the social activities she enjoyed previously. "We note that a self-imposed restriction *not* based on real or perceived pain can be considered." *McDanield, supra* at 283 (emphasis in original). These impairments may or may not be self-imposed, but they

arise from dizziness and confusion *in addition to* pain. The "trajectory" of plaintiff's "normal" life, past the age of 70, where her ability to take care of herself and enjoy socializing with friends and family, would seem to have been, at least, potentially affected.

Moreover, defendants apparently dispute some of these complaints, giving rise to a "factual dispute concerning the nature and extent of the person's injuries" that is "material to the determination as to whether the person has suffered a serious impairment of body function." Therefore, the conditions of MCL 500.3135(2)(a) necessary to make the determination one of law for the court are not satisfied. We conclude that, notwithstanding the fact that no allopathic surgeon provided the requisite testimony to satisfy the second sentence of MCL 500.3135(2)(a)(ii), the trial court erred in granting summary disposition with respect to the closed head injury.

The parties do not dispute the existence of plaintiff's scar, which must, by definition, be a "disfigurement" that it is "permanent." By implication from the definition of "serious" used in the context of an injury, a "serious" disfigurement must be a "severe" one. See *Churchman, supra* at 230. However, "seriousness" is based on the physical characteristics of the disfigurement more than the effect it has on a given plaintiff's life.[2] *Nelson v Myers*, 146 Mich App 444, 446; 381 NW2d 407 (1985). Furthermore, "the seriousness of a scar . . . is a matter of the common knowledge and experience of the trial bench in the first instance and, if the case goes to it, the jury." *Id.* at 446 n 2. It used to be that seriousness was "a jury question except in the most extreme cases." *Petaja v Guck*, 178 Mich App 577, 579; 444 NW2d 209 (1989). However, 1995 PA 222 made both

---

[2] This does not mean the effect on the plaintiff's life is unimportant.

serious impairment and permanent serious disfigure-
ment initially threshold questions for the court. *Kern v
Blethen-Coluni*, 240 Mich App 333, 338; 612 NW2d 838
(2000). Nevertheless, it is only a question of law absent
a genuine outcome-determinative factual dispute. We
further infer from *Kreiner* that the inquiry should be in
the context of the particular individual plaintiff. The
emotional effect of any disfigurement is also highly
relevant. *Earls v Herrick*, 107 Mich App 657, 668; 309
NW2d 694 (1981). Therefore, although the various
factors must be judged in an objective manner, the
factors *themselves* are highly subjective. See *Nelson,
supra* at 446.

Plaintiff contends that her scar causes her a consid-
erable amount of embarrassment and discomfort, as
well as an inability to move her eyebrow in a "normal"
manner. Defendants discount the scar as objectively too
minor to constitute serious disfigurement. It appears
that the parties dispute not only the effect of the scar on
plaintiff, but the extent of the damage as well. Assum-
ing that plaintiff's contentions are true, the scar is not
only visible, it causes a functional problem with her
ability to express emotions or otherwise communicate
nonverbally. If the issue were purely a cosmetic one, we
would find this to be a much closer question. However,
quite aside from appearance and embarrassment, a
great deal of human face-to-face communication is
nonverbal—it involves facial expressions and bodily
gestures that are, consciously or subconsciously, at-
tended to and interpreted by others. If plaintiff truly
cannot move her eyebrow in a normal or natural
manner, that could add to a claim of disfigurement. And
if a significant amount of her interaction with others is
face-to-face, the scar could *objectively* be determined to
have a great effect on her life. We therefore find that the

parties' factual dispute regarding the scar is sufficient to give rise to a jury question.

The dissent states that some of our conclusions either ignore the facts or are purely speculative. It is certainly true as a matter of law that a mere " 'explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference' " is not a sufficient basis for a party opposing a motion for summary disposition to survive it. *Bennett v Detroit Police Chief*, 274 Mich App 307, 319; 732 NW2d 164 (2006), quoting *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 486; 502 NW2d 742 (1993). However, the purpose of summary disposition is not to deny parties with apparently weak cases the chance to have their day in court and their right to present their cases; rather, the purpose is to avoid pointlessly wasting resources by sending a matter to trial when there is no actual dispute to resolve. *Moll v Abbott Laboratories*, 444 Mich 1, 26-28; 506 NW2d 816 (1993). Indeed, a court is not *permitted* to make findings of fact when deciding a motion for summary disposition. *Jackhill Oil Co v Powell Production, Inc*, 210 Mich App 114, 117; 532 NW2d 866 (1995). This is, of course, obvious, given that, if there is a need to make factual findings, granting summary disposition is, by definition, impermissible under the plain language of MCR 2.116(C)(10).

In effect, summary disposition is intended to facilitate two important Michigan public policies: resolution of disputes on their merits and avoidance of unnecessary expenditures where there is no actual dispute or where the only material dispute is over a point of law. The courts exist to resolve disputes. The dissent observes, correctly, that we are uncertain whether plaintiff can prevail with her claims in the end. However, at the summary disposition stage of proceedings, a party

generally has not yet been afforded the opportunity to develop a case as well as possible, so matters will usually be at least somewhat unsettled. We obviously have no way to know whether plaintiff would prevail with her claims at trial; if we did, it would be appropriate to grant summary disposition in her favor. See MCR 2.116(I)(2). Our holding is that some of plaintiff's claims are not so obviously devoid of all arguable merit that she should be denied the opportunity to be heard, to develop her case fully, and to have her day in court. Again, this case comes to us in the posture of a motion to summarily dismiss plaintiff's claims; the question is not whether she *will* prevail at trial, but whether there is more than a "mere possibility" or a "mere promise" that she *could*. *Maiden*, *supra* at 121. The question before us is not whether plaintiff will satisfy the *Kreiner* requirements at trial. The question is whether there is a genuine factual question whether she could. On the basis of our review of the facts that have been presented to us, we conclude that there is. For that reason, summary disposition was inappropriate.

We affirm the trial court's grant of summary disposition to defendants regarding plaintiff's broken toe and cervical strain, we reverse the trial court's grant of summary disposition regarding the closed head injury and the scar, and we remand for further proceedings. We do not retain jurisdiction.

O'CONNELL, P.J. *(concurring)*. I write separately to address the scars above plaintiff's right eye.

Plaintiff, a 67-year-old senior citizen, was lawfully crossing the street when a 4,000-pound police cruiser collided with her, sending her feet straight up in the air and tossing her body onto the pavement to the right of the moving patrol car. The pavement tore the skin

above her right eye, and the cut bled profusely. Plaintiff's shoes were found in the road 15 feet from the point of impact, and the cruiser's momentum carried it forward nine feet before it could stop.[1]

The police officer immediately called for an ambulance and began administering first aid. Plaintiff suffered numerous injuries, including the aches and pains one would expect from being struck by a fully equipped, two-ton police car going between 15 and 20 miles an hour. She suffered a broken toe and a cervical strain. She was also treated for a closed head injury and the laceration on her head. Emergency room personnel described the laceration as "a rather large forehead laceration, . . . which is T-shaped over the right eye." It required numerous stitches[2] to close, and its resultant scar is approximately 13 millimeters in length with a "complex of scars" above it.[3] Pictures of plaintiff's face reveal a triangular-type area of scar tissue that, according to plastic surgeon James Lawson, could be "excised and closed by buried suture plastic technique to greatly improve their appearance."

Our no-fault system allows a plaintiff to collect damages if a scar is a "permanent serious disfigurement." MCL 500.3135(1). The pictures reveal that these irregularly shaped scars sharply contrast with plaintiff's skin tone. They are readily noticeable to anyone who would look plaintiff in the eye, and it will not abate without serious surgical intervention. See *Kanaziz v*

---

[1] All parties agree that the officer is at fault for the accident.

[2] The emergency room report states: "Multiple sutures of 5-0 and 6-0 Vicryl were used to approximate the deep portions of his [sic] wound and multiple sutures of 5-0 and 6-0 nylon were used to approximate the superficial tissue. Two sutures of 6-0 nylon were placed in an interrupted fashion on the eyelid laceration."

[3] A second scar above it is 11 millimeters in length. Added together, plaintiff has 22 millimeters of scar tissue above her right eye.

*Rounds*, 153 Mich App 180, 185-187; 395 NW2d 278 (1986). In my opinion, a genuine factual issue regarding the severity of the scars is created by the pictures and Dr. Lawson's testimony that corrective surgery is necessary to ameliorate the primary scar and the "complex of scars" above it. In other words, the jury should decide if, in fact, the scar is a "permanent serious disfigurement." MCL 500.3135(2)(a).

MURRAY, J. (*concurring in part and dissenting in part*). I concur with the majority's decision to affirm the trial court's order granting defendants' motion for summary disposition regarding plaintiff's broken toe and cervical strain. Additionally, there is full agreement on the point of law that, even though plaintiff did not submit the necessary evidence to support a claim under MCL 500.3135(2)(a)(ii), she can still seek to establish a claim under the serious impairment of body function provision of the statute. MCL 500.5135(1). This has been clear since at least *Churchman v Rickerson*, 240 Mich App 223, 232; 611 NW2d 333 (2000).

However, I part ways with the majority's decision to reverse the trial court's order granting defendants' motion for summary disposition regarding plaintiff's closed head injury and scar. In my view, there was no dispute in the evidence regarding the nature and extent of plaintiff's closed head injury and scar, and, thus, the trial court properly decided as a matter of law whether the respective injuries constituted a "serious impairment of body function" and a "serious permanent disfigurement." Furthermore, in doing so the trial court correctly held that the evidence presented established that plaintiff's closed head injury did not affect her general ability to lead her normal pre-accident life and that plaintiff's scar did not constitute a "permanent serious disfigurement." I would therefore affirm in its

entirety the trial court's order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(10).

## I. FACTS AND PROCEEDINGS

This case involves a very sympathetic plaintiff: a 67-year old woman who was hit by a police car as she was lawfully crossing a street.[1] However, despite my sympathies for her, an objective view of the record confirms what the trial court concluded: plaintiff's temporary and minor injuries did not cause a serious impairment of a body function, and the scar above her eye, though permanent, is not "serious" as defined by the law.

Prior to being injured, plaintiff was receiving Social Security disability benefits after becoming disabled from kidney surgery. After that surgery, plaintiff suffered chronic, long-term back pain that prevented her from any lifting (per doctor's orders) or standing for long periods. As a consequence, plaintiff had family members (some of whom lived with her) who helped her clean the house, cook, and do laundry.

---

[1] The concurring opinion seems to place much emphasis on how the accident occurred, such as the weight of the vehicle, how far it traveled after impact, etc. However, how plaintiff was injured has no relevance to the determination whether her scar constitutes a permanent serious disfigurement. *Nelson v Myers,* 146 Mich App 444, 446; 381 NW2d 407 (1985) (holding that the seriousness of a scar depends only on its physical characteristics). See, also, *Shavers v Attorney General,* 402 Mich 554, 628; 267 NW2d 72 (1978) (noting that one of the legislative purposes in abolishing tort remedies through the no-fault act was to eliminate the need for accident investigations as fault is never at issue). Indeed, the concurring opinion certainly cannot be implying that if plaintiff had been more directly struck by a lightweight hybrid car moving one mile an hour, but still suffered the same injuries, it would have any relevance to the actual injury she suffered.

As a result of the accident, plaintiff suffered a fractured toe, a cervical strain, a laceration above her right eyebrow, and a mild closed head injury. However, the effects from each of the injuries (excluding the scar) lasted no more than four months, and none led to any physician-imposed restrictions.[2] Additionally, plaintiff's post-accident life was essentially as it was pre-accident. Hence, when presented with defendants' motion for summary disposition, the trial court held that plaintiff had not presented evidence sufficient to establish that she suffered a serious impairment of body function:

> Looking at the totality of the circumstances, it is the opinion of the court that plaintiff has not suffered a serious impairment of body function. Plaintiff had physician imposed restrictions relating to heavy lifting, bending, and prolonged standing for several months following the accident, but these were similar restrictions as those she had prior to the accident which were the result of her kidney surgery. Plaintiff states that since the accident, she has required assistance with household chores, however, her daughters and grandsons were already providing much of this assistance before the accident occurred. Although plaintiff argues that her social activities have changed, this is not the result of any physician-imposed restriction. Immediately following the accident plaintiff stopped playing cards with her sisters due to the neck pain, but according to plaintiff's own testimony, her neck pain has since resolved. Plaintiff states that she does not walk as much or dance to the radio any more, but again, these appear to be self-imposed restrictions. The fact that plaintiff has some lingering pain and forgetfulness, which has

---

[2] In her deposition, plaintiff testified as follows:

   *Q*: Okay. Has any doctor restricted your activities since the accident?

   *A*: No.

not significantly altered her life, is insufficient to overcome the high threshold statutorily demanded.

The trial court then addressed whether plaintiff's scar was a permanent serious disfigurement, and held that it was a permanent disfigurement but not a "serious one":

> Likewise, the scar on plaintiff's forehead does not constitute a permanent serious disfigurement. Whether a scar is a permanent serious disfigurement depends of the scar's physical characteristics rather than its effect on a person's ability to lead a normal life. [*Kosack*] *v Moore*, 144 Mich App 485, [491; 375 NW2d 742] (1985). Whether a scar is serious is a question to be answered by resorting to common knowledge and experience. *Nelson v Meyers*, 146 Mich App 444, 446 n 2 [381 NW2d 407] (1985). The scar must be readily noticeable; one that is "hardly discernable" will not be a permanent serious disfigurement. *Petaja v Guck*, 178 Mich App 577, 579-580 [444 NW2d 209] (1989).
>
> The scar on plaintiff's forehead is comprised of two parts one 11 millimeters and the other 13 millimeters in length. The color of the scar is slightly lighter than the surrounding skin tone. The scar is undeniably permanent, and considering its characteristics, including its size, color, and location, it is apparent that it constitutes a disfigurement. Nevertheless, it does not have the requisite seriousness to satisfy MCL 500.3135(1). The scar is relatively small and, upon review of the color photographs provided, is not readily noticeable. Indeed, recent case law lends support to the decision that plaintiff has not suffered a permanent serious disfigurement. See *Collins v Davis*, unpublished opinion per curiam of the Court of Appeal, decided October 13, 2005 (Docket No. 256055) (four centimeter scar on forehead is not a permanent serious disfigurement); *Goodwin v MacKellar*, unpublished opinion per curiam of the Court of Appeals, decided January 25, 2005 (Docket No. 250280) (1.25 inch scar located near the eyebrow is not a serious disfigurement).

Plaintiff's appeal challenges each aspect of the trial court's ruling.

II. ANALYSIS

As noted by the majority, we review a trial court's decision to grant or deny a motion for summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law. *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). Similarly, the meaning of a statute is a question of law that we review de novo. *Michigan Muni Liability & Prop Pool v Muskegon Co Bd of Co Rd Comm'rs*, 235 Mich App 183, 189; 597 NW2d 187 (1999).

A. SERIOUS IMPAIRMENT OF BODY FUNCTION

The general purpose of the no-fault insurance act was to partially abolish tort remedies for injuries sustained in motor vehicle accidents and to substitute first-party insurance benefits in the place of tort remedies. *Stephens v Dixon*, 449 Mich 531, 541; 536 NW2d 755 (1995). Under the no-fault insurance act, a person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person suffered death, serious impairment of body function, or permanent serious disfigurement. *Id.* at 539; MCL 500.3135(1).

A "serious impairment of body function" is defined as an objectively manifested impairment of an important body function that affects a person's general ability to lead his or her normal life. *Kreiner v Fischer*, 471 Mich 109, 130; 683 NW2d 611 (2004); MCL 500.3135(7). To determine if an individual has suffered a "serious impairment of body function," the effect of the impairment on the course of a plaintiff's entire normal life must be considered. Although some aspects of a plaintiff's entire normal life may be interrupted by the

impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's "general ability" to lead his or her normal life has not been affected and he or she does not meet the "serious impairment of body function" threshold. *Id.* at 131. In *Kreiner*, our Supreme Court developed a multistep process to identify "whether a plaintiff who alleges a 'serious impairment of body function' as a result of a motor vehicle accident meets the statutory threshold for third-party tort recovery." *Id.* The first step of the *Kreiner* analysis requires a court to "determine that there is no factual dispute concerning the nature and extent of the person's injuries," or that any dispute is immaterial. *Id.* at 132. If this is the case, then the trial court decides as a matter of law whether the plaintiff suffered a serious impairment of body function, unless a closed head injury is involved and a licensed allopathic or osteopathic physician, who regularly treats closed head injuries, testifies that the plaintiff may have suffered a "serious neurological injury." MCL 500.3135(2)(a).

Here, in relevant part, the parties do not dispute the nature and extent of plaintiff's closed head injury. Contrary to the majority's general conclusion that defendant "disputes some of these complaints, giving rise to a 'factual dispute concerning the nature and extent of [plaintiff's] injuries,' " any "dispute" regarding what the majority lists as plaintiff's "complaints" are strictly limited to how plaintiff's closed head injury affected her general ability to lead her normal life, and are not disputes concerning the nature and extent of the closed head injury. Therefore, the trial court properly decided this issue as a matter of law. MCL 500.3135(2)(a). Since the trial court could properly decide whether plaintiff's closed head injury constituted a serious impairment of body function, it correctly

completed the *Kreiner* analysis by determining if plaintiff's closed head injury constituted an impairment of an important body function, whether any such impairment is objectively manifested, and, if so, whether "the impairment affects [her] general ability to lead [a] normal life." *Kreiner, supra* at 132.

The trial court, in ruling on defendants' motion for summary disposition, properly compared plaintiff's preinjury life with her post-injury life to determine whether the closed head injury affected her ability to lead her normal life. As the *Kreiner* Court declared:

> In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his [or her] life. Merely "*any* effect" on the plaintiff's life is insufficient because a de minimis effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his [or her] life." [*Id.* at 132-133.]

The *Kreiner* Court went on to list five nonexclusive, nonexhaustive objective factors to assist a court in evaluating whether an impairment has affected a plaintiff's "general ability" to lead or conduct the course of his or her normal life: "(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery." *Id.* at 133. The five factors are not intended to be individually dispositive, but rather are intended to serve as a framework by which to view the totality of the circumstances and determine

whether the plaintiff's impairments affect his or her general ability to conduct the course of his or her normal life. *Id.* at 133-134.

It is important to recognize that a temporary impairment can still be a serious impairment of a body function. *Kreiner, supra* at 134 ("that the duration of the impairment is short does not necessarily preclude a finding of a 'serious impairment of body function' "). Nonetheless, what must be established by the evidence is that the impairment "actually affected the plaintiff's 'general ability' to conduct the course of [her] life," *Id.* at 133, which as noted requires a comparison of a plaintiff's pre-accident life to her post-accident life, to see whether the plaintiff "is, 'for the most part' able to lead [her] life." *Id.* at 130.

Viewing the evidence submitted to the trial court in a light most favorable to plaintiff, the trial court did not err in granting defendants' motion on this issue. As noted in part I of this opinion, before the accident, plaintiff was receiving Social Security disability payments, was suffering from significant low back pain, and was restricted by her physician from any heavy lifting or prolonged standing. Plaintiff also required the assistance of family members with her household work, and plaintiff did not drive an automobile. As a result of the August accident, plaintiff suffered a mild head injury.[3] However, it is undisputed that by December, some four months after the accident, plaintiff's physician had concluded that plaintiff had fully recovered and no longer needed any physician care. Plaintiff also admitted that her headaches and the dizziness had essentially subsided, and she did not seek any further

---

[3] As the majority correctly holds, plaintiff's fractured toe and cervical strain were not serious and did not in any way affect her general ability to lead her normal life.

medical attention. Additionally, according to plaintiff's deposition testimony, no restrictions were ever placed on her by a physician.

In light of these facts, it is evident the injuries did not change the course or trajectory of plaintiff's life. Plaintiff still had assistance from her family as she had in the past, plaintiff still did not drive a car, and plaintiff essentially carried on with her life as she had in the past. Indeed, although plaintiff imposed some limitations on her social activities during the August through December time frame—that was by her own choice. *Kreiner, supra* at 133 n 17. Hence, the trial court correctly held the plaintiff had not established that her impairment interfered with her general ability to lead a normal life.

With due respect for my two distinguished colleagues, the lead opinion seems to gloss over both the facts and the law. The majority's reversal is based on its conclusion that plaintiff's ability to care for herself and socialize with her friends "would seem to have been at least potentially affected."[4] But that is clearly not the test identified by the Legislature or the Supreme Court, and is in fact a much lower threshold. Our duty, however, is to follow our Supreme Court's precedent, *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993), and the *Kreiner* test of whether, despite the impairment, plaintiff was "for the most part" able to lead her normal life is simply not the same as the majority's conclusion that some of plaintiff's activities "at least potentially" would seem to have been affected.

In addition, to hold that, despite the evidence noted above, plaintiff's ability to care for herself and socialize

---

[4] The majority also concludes that there is a factual dispute regarding the nature and extent of plaintiff's injuries, but that issue has already been addressed.

"would seem to have been" affected is sheer specula-
tion, and speculation is an improper means of resolv-
ing a motion for summary disposition. *Bennett v
Detroit Police Chief,* 274 Mich App 307, 319; 732
NW2d 104 (2006). Moreover, the motion was decided
after discovery had closed, so plaintiff had to present
all the evidence in support of her claim at the time
the motion was decided. *Peña v Ingham Co Rd Comm,*
255 Mich App 299, 313 n 4; 660 NW2d 351 (2003).
Because there was no material dispute about the
nature and extent of plaintiff's injury, the question
was one of law for the court, not the jury. MCL
500.3135(2); *Kern v Blethen-Coluni,* 240 Mich App
333, 341-342; 612 NW2d 838 (2000). The trial court
should be affirmed on this issue.

### B. PERMANENT SERIOUS DISFIGUREMENT

Admittedly, the only dispute between the parties
regarding plaintiff's scar—its "seriousness"—is a closer
question. As noted by the majority, determining the
"seriousness" of a scar is a matter of common knowl-
edge and experience for the courts unless there is a
question regarding the nature and extent of the plain-
tiff's scar. MCL 500.3135(2)(a); *Kern, supra* at 338;
*Nelson v Myers,* 146 Mich App 444, 446; 381 NW2d 407
(1985). There is no such question here, though, because
we have plaintiff's exhibits (color photographs) showing
the scar, and plaintiff's testimony about the scar. There-
fore, contrary to the majority's conclusion that a factual
dispute regarding the scar exists, the determination
whether plaintiff's scar constituted a "permanent seri-
ous disfigurement" was also a question of law to be
decided by the trial court. MCL 500.3135(2)(a).

The seriousness of a scar "depends on its physical
characteristics rather than its effect on [a] plaintiff's

ability to live a normal life." *Myers, supra* at 446. The undisputed evidence, which is comprised of the color photographs of the scar, reveal a 13 millimeter scar above plaintiff's eyebrow that is only slightly lighter in color than plaintiff's skin tone. Additionally, plaintiff testified that it "itches" and, when she frowns, it bothers her. And, even though plaintiff stated that she was "somewhat" embarrassed about her scar, she has to date foregone the option of corrective surgery. More importantly, a plaintiff's embarrassment and sensitivity about her appearance are a subjective reaction to a condition that must be objectively judged by the trial court, and do not always create a question of fact.[5] *Id.* Thus, the trial court did not err in concluding that plaintiff's scar did not constitute a "permanent serious disfigurement." See *id.* at 446-447 (holding that a three centimeter scar under a plaintiff's left eye, which was slightly depressed, and was slightly lighter than surrounding skin, was not a permanent serious disfigurement).

In light of the foregoing discussion, I would affirm the trial court's order granting defendants' motion for summary disposition.

---

[5] The only cases (all unpublished) that plaintiff cites where the trial court found that a plaintiff's scar constituted a "serious permanent disfigurement" all involved scars that were "drastically darker than the surrounding skin," and were at least 20 millimeters. And that is because a scar must be readily noticeable; a scar that is "hardly discernible" will not be a "permanent serious disfigurement." *Petaja v Guck*, 178 Mich App 577, 579-580; 444 NW2d 209 (1989).