*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PETER M. MORAIS, as Next Friend for SGM,

        Plaintiff-Appellant,

v

JAMES ROBERT DAVID WHITEFORD and
HALEY YVONNE WHITEFORD, also known as
HALEY YVONNE QUERRO,

        Defendants-Appellees.

UNPUBLISHED
July 10, 2025
2:21 PM

No. 370920
Oakland Circuit Court
LC No. 2023-198092-NI

Before: MALDONADO, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

In this case arising under the no-fault act, MCL 500.3101 *et seq*., plaintiff Peter M. Morais, as Next Friend for SGM, appeals as of right the trial court's April 4, 2024 opinion and order granting summary disposition in favor of defendants James Robert David Whiteford and Haley Yvonne Whiteford pursuant to MCR 2.116(C)(10). On appeal, plaintiff argues that the trial court erred by concluding that minor child SGM, who was struck by a vehicle driven by defendant James Whiteford while walking across the road, did not suffer "serious impairment of body function" or "permanent serious disfigurement" necessary to maintain a tort action for non-economic loss under MCL 500.3135. We affirm.

## I. FACTS AND BACKGROUND

On January 6, 2023, plaintiff filed his complaint against defendants, alleging that, on or about August 30, 2021, defendant James Whiteford, in a car owned by defendant Haley Whiteford, struck SGM as she was walking in a designated crosswalk on a Ferndale street. Plaintiff alleges Whiteford disregarded a stop sign and acted negligently to cause the accident. Plaintiff continued in his complaint:

> 12. That as a direct and proximate result of the aforesaid negligence and breaches of duties of the Defendants, Plaintiff's minor was made to suffer serious and disabling injuries to her skeletal system, nervous system, and the muscles,

-1-

tendons, ligaments, nerves, and tissues of her legs, feet, knees, shoulders, arms, neck and back, and other parts of her body . . . .

13. That as a result of the aforesaid accident, the Plaintiff's minor suffered, continues to suffer, and will continue to suffer great pain, discomfort, embarrassment, humiliation, mental anguish, depression, gross anxiety, indignity, and inconvenience.

14. That due to the permanent nature of said injuries, Plaintiff's minor has suffered lost wages, has become disabled, and has suffered excess wage loss.

15. That prior to the accident, Plaintiff's minor was in reasonably good health and was able to and did participate in and enjoy the usual activities of life, but since said accident, Plaintiff's minor has been under medical care and in a state of pain, stress, and/or discomfort, all preventing her from engaging in many of those activities she engaged in prior to the accident.

Plaintiff sought damages exceeding $25,000 under MCL 500.3135.

On November 6, 2023, defendants moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff failed to show that SGM suffered "serious impairment of body function" or "permanent serious disfigurement" for the purposes of MCL 500.3135. In the accompanying brief, defendants concede that because SGM "presumably scraped her legs as a result of the accident," she suffered an "objective manifestation" of injury. However, defendants argued, SGM did not suffer an effect on her "general ability to lead . . . her normal life." Defendants contend that plaintiff has not provided any medical records to them regarding SGM's treatment at the hospital emergency room, nor has he provided any photographs of SGM's alleged scarring. Further, defendants say SGM testified at her deposition that the hospital emergency room simply "cleaned out" her wounds and conducted x-rays, which were negative, before discharging her that day. Additionally, SGM visited a chiropractor twice after the accident and was not placed under any restrictions by the chiropractor, and SGM was not treated by another doctor or prescribed any medication after the accident. Defendants also note SGM missed school the day of and the day after the accident, but she returned to school on the third day without any restrictions and that she continued to work at one of her two summer jobs during the school year. Additionally, defendants cited SGM's deposition testimony regarding her alleged scarring:

A. Well, I couldn't like hang out with my friends as often or wear the clothes I wanted to at the time.

Q. So I assume the scrapes or the areas that had to be cleaned out with alcohol on your shins took some time to heal. How long did those take to heal before you were -- felt like you were back to normal, so to speak?

A. Like two months.

Q. And was that because the skin was scraped and you had like scabs on it because of the actual scraping of your skin against the cement?

-2-

A. My skin was exposed and we had to keep it moisturized and covered and wrapped, and that made it difficult for me to go out with my friends and wear the clothes I wanted to wear.

Q. Okay. And I assume you could wear pants, but you couldn't wear skirts, right?

A. Yeah.

* * *

Q. So you were limited to basically wearing pants for approximately two months?

A. Yeah.

Defendants accordingly argued that SGM did not suffer "serious impairment of body function" or "permanent serious disfigurement" for the purposes of MCL 500.3135 and, as a result, plaintiff could not maintain the instant tort action for non-economic damages.

Plaintiff, in his response, argued that SGM suffered "serious impairment of body function" for the following reasons:

[SGM] testified that there were a variety of ways in which her life was impacted and affected by the injuries that she experienced from this accident. She testified she was not able to hang around with her friends as often or wear the clothes that she wanted to after the accident. Due to the scabbing on her legs and shoulder, her wounds had to be cleaned out with alcohol and ointment applied for two months after the accident occurred. She was forced to keep the skin moisturized with an ointment and to wrap and cover the areas which made it difficult for her to go and out and see her friends and wear the type of clothing and she wanted to wear.

* * *

[SGM] testified that the scarring causes her social problems including humiliation and embarrassment due to the marks left on her skin and the remarks made by her fellow students. In fact, after she was bandaged, she was getting a lot of remarks made to her and people still mention that she has a discoloration from the scarring.

In addition to the permanent scarring, [SGM] testified that she does continue to have pain in her legs, lower back, right hip and right knee that presents randomly 2 and ½ years after the accident. There is also security camera footage from what occurred that was made public to different classmates at her school which caused her to be the brunt of many jokes and continues to be talked about today. [Citations omitted.]

-3-

Plaintiff alternatively argued that SGM suffered "permanent serious disfigurement," stating:

> [SGM] has suffered a serious and permanent disfigurement to her leg. The photos of her abrasions shortly after the accident demonstrate the extent and nature of her scarring and disfigurement. The current photograph of her leg shows that the discoloration and scarring is permanent and demonstrates clear evidence of a serious disfigurement.
>
> * * *
>
> [SGM] also testified to the affect that the scarring on her legs has had because of the road rash and abrasions. [SGM] has discoloration from the scars that have become quite visible as a result of the difference in tone. She described the scarred areas as being lighter as opposed to her surrounding skin. This is reflected in the photograph attached hereto that demonstrates that the scarring will be permanent. In fact, the photos demonstrate the nature of the disfigurement which after 2 and ½ years remains visible to the point that it will be a permanent serious disfigurement. [Citations omitted.]

Thus, plaintiff argued, the trial court should deny defendants' motion for summary disposition and grant summary disposition in his favor under MCR 2.116(I)(2).[1]

A few days later, on January 8, 2024, plaintiff moved to file a supplemental brief and affidavit, explaining that "[SGM] was seen by Dr. Jiab Suleiman, a board-certified orthopedic surgeon on December 29, 2023 pursuant to complaints she was still having from the injuries to her body she suffered from the accident." Plaintiff sought to have Dr. Suleiman's affidavit considered by the trial court when deciding defendants' motion for summary disposition.[2] That affidavit stated, in relevant part:

---

[1] The photographs, taken shortly after the accident, which plaintiff attached to his response show significant, visible wounds to SGM's back and legs. However, the only photograph that plaintiff attached to his response to reflect SGM's current alleged disfigurement was a single, grainy photograph of her leg that, upon careful examination, indicates that part of her shin is a slightly different color than the remainder of her leg.

Those photographs are reflected in the electronic record in black and white, not color, as they apparently were submitted to the trial court in that manner. The fact that the photograph at issue is non-colorized renders it difficult to identify any significant discoloration or scarring.

[2] The trial court granted plaintiff's motion and accepted the affidavit, notwithstanding defendants' observation in a brief filed that day that the visitation with Dr. Suleiman occurred "[a]fter [SGM] was deposed and discovery closed," and "after not having sought any medical treatment related to the accident in more than two years."

5. I have had the opportunity to treat [SGM] as a patient when she presented to my office on December 29, 2023.

6. As a result of her presentation for treatment and the history of her involvement in a motor vehicle versus pedestrian accident that occurred on August 30, 2021, I found objective evidence of injury and impairment to her musculoskeletal system in her hip, knee, and back as a result of my physical examination.

7. Due to my findings from my physical examination and the history of her involvement in the motor vehicle accident on August 30, 2021, I found it medically reasonable and necessary to order MRI testing to further evaluate her musculoskeletal injuries.

8. Additionally, I observed scarring and skin discoloration to her legs resulting from the scarring that occurred from the abrasions suffered when she was struck by a motor vehicle and dragged along the pavement.

9. Based upon my experience and medical treating as a treating physician, I believe that the scarring and discoloration to her body caused by the abrasions suffered from the August 30, 2021 accident will be a permanent and serious disfigurement.

10. In my opinion, based upon my training, experience, and within a reasonable degree of medical certainty, I believe that he musculoskeletal injuries and scarring were caused by her involvement in the August 30, 2021 motor vehicle versus pedestrian accident.

On April 4, 2024, the trial court granted defendants' motion for summary disposition, reasoning:

Plaintiff here was treated at an emergency room at Beaumont hospital the day of the accident wherein Plaintiff testified that staff took x-rays and cleaned her wounds. She sought chiropractic treatment twice, approximately a month after the accident, and did not seek any other treatment until over 2 years later with Dr. Sulieman [sic], an orthopedic surgeon, where she complained of pain. Dr. Suleiman opined after his physical examination, without the benefit of an MRI, that Plaintiff suffered musculoskeletal injuries that were caused by the accident. The Court notes that Plaintiff saw Dr. Suleiman after her deposition was taken and after the motion for summary disposition was filed so Defendants' were unable to address this opinion in the motion. Neither party attached any records from Beaumont and Plaintiff allegedly failed to provide them in discovery. The Plaintiff argues that the extent of her scarring is evident from the photographs attached to the response which were taken a few days after the accident. The Plaintiff also attached a blurry, black and white, "current photograph" that is undated, but does show slight discoloration of the Plaintiff's skin and potential scarring.

* * *

In viewing the evidence in the light most favorable to the Plaintiff, and because the Court should not question credibility in a motion for summary disposition, the Court concludes that Plaintiff managed, albeit barely, to establish a genuine issue of material fact on whether she sustained a permanent serious disfigurement and/or an impairment of an important body function.

However, based on Plaintiff's deposition testimony, the Court finds that she is unable to meet the third-prong of *McCormick*-an impairment which affects the person's general ability to lead his or her normal life. She testified that she couldn't hang out with friends or wear the clothes she wanted at the time and she was limited to wearing pants for two months. At the time of her deposition in September of 2023, she testified that there was nothing she avoided or couldn't do because of back or leg pain. She was not restricted from any activities by a doctor. The Plaintiff missed two days of school, and had to alter her clothing for a short period of time. The Plaintiff did not play sports before or after the accident and her classes and activities were not restricted in any way. The Plaintiff has not shown that her general ability to lead her normal life was affected.

Plaintiff moved for reconsideration, attaching documentary evidence indicating that on January 14, 2024, SGM was examined through an MRI on her spine. The MRI results provided, in relevant part, that "[t]here is minimal anterosuperior vertebral body height loss at T1 and T2 without associated edema. Findings could be congenital/developmental versus from old fractures. No osseous or disc retropulsion. Straightening of the cervical lordosis." Most of the remaining results appeared to be normal, although a few results apparently indicated some type of minor issue, such as the following: L4-5: Borderline left posterolateral disc height loss. Minimal posterior disc bulge less than 2 mm AP. Mild to moderate left, minimal right facet arthrosis, minimal facet joint fluid. No central spinal canal, lateral recess, or neural foraminal stenosis. There is nothing in plaintiff's motion and brief for reconsideration, or any of the documentary exhibits attached thereto, that explain the meaning of these MRI results or that indicate whether these MRI results may fairly be connected to the accident at issue.

The trial court denied the motion for reconsideration. Plaintiff now appeals, primarily arguing that the trial court erred by suggesting that an injured person must show "an impairment which affects the person's general ability to lead his or her normal life" as an element of "permanent serious disfigurement." According to plaintiff, the element of "affects the injured person's general ability to lead his or her normal life" is an element of "serious impairment of body function," not "permanent serious disfigurement." Plaintiff further argues that he established a genuine issue of material fact regarding both "serious impairment of body function" and "permanent serious disfigurement." Defendants, on the other hand, argue that plaintiff failed to establish a genuine issue of material fact on either of these matters.

We agree with plaintiff that, as defendants also seemingly concede on appeal, the trial court erred by suggesting that the element of "affects the injured person's general ability to lead his or

her normal life" is an element of "permanent serious disfigurement."[3]  Nonetheless, we agree with defendants that plaintiff failed to establish a genuine issue of material fact regarding either "serious impairment of body function" or "permanent serious disfigurement."

## II.  STANDARD OF REVIEW

"Appellate review of the grant or denial of a summary-disposition motion is de novo, and the court views the evidence in the light most favorable to the party opposing the motion." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).  "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*.  "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*.

## III.  DISCUSSION

Under the no-fault act, "tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances." *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010).  In this regard, MCL 500.3135 provides, in relevant part:

> (1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.
>
> (2) For a cause of action for damages under subsection (1) . . . , all of the following apply:

---

[3] As explained *infra*, MCL 500.3135(1) allows for tort recovery of non-economic damages in the event of "serious impairment of body function" or "permanent serious disfigurement."  MCL 500.3135(5), in turn, sets forth three elements of "serious impairment of body function": (1) objectively manifested, (2) important body function, and (3) affects the injured person's general ability to lead his or her normal life.  See MCL 500.3135(5)(a) to (c).  There is no statutory language or caselaw indicating that the third element of "serious impairment of body function" also applies to "permanent serious disfigurement."

We briefly note that defendants argue on appeal that plaintiff "invited error" in this regard by contending in the trial court that "[SGM's] scarring was serious based on her claim that it impacted her ability to lead her life."  We disagree.  The mere fact that plaintiff discussed the circumstances of this case in this manner falls short of any type of concession about statutory language.  See *Vannoy v City of Warren*, 386 Mich 686, 690; 194 NW2d 304 (1972) (discussing the invited-error doctrine).

(a) The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(*i*) There is no factual dispute concerning the nature and extent of the person's injuries.

(*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement. . . .

* * *

(5) As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:

(a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.

(b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.

(c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

Concerning the term "serious impairment of body function," "[t]he inquiry focuses on whether the impairment is objectively manifested, not the injury or its symptoms." *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018) (cleaned up). "Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested." *Id*. at 607. Further, concerning the term "permanent serious disfigurement," "a threshold disfigurement is a long-lasting and significant change that mars or deforms the injured person's appearance." *Fisher v Blankenship*, 286 Mich App 54, 66; 777 NW2d 469 (2009). "In assessing whether a particular change in appearance meets the disfigurement threshold, this Court has held that the determination depends on the physical characteristics of the injury rather than the effect of the injury on the plaintiff's ability to lead a normal life." *Id*.

## A. SERIOUS IMPAIRMENT OF BODY FUNCTION

On appeal, defendants concede that SGM suffered an "objectively manifested" impairment of body function, as she had temporary visible wounds after the accident. See MCL 500.3135(5)(a). Defendants also concede that there is at least a question of fact as to whether

SGM suffered "an impairment of an important body function." See MCL 500.3135(5)(b). However, defendants challenge the third element of "serious impairment of body function," namely, whether that impairment "affects the injured person's general ability to lead his or her normal life." See MCL 500.3135(5)(c). According to defendants, "comparing [SGM's] life before and after the accident reveals **no** appreciable difference. As such, reasonable minds could not differ regarding [SGM's] failure to allege an impairment that impacted her general ability to lead her normal life." (Emphasis in original.) Plaintiff, on the other hand, argues that there is sufficient evidence in the record to establish a question of fact as to the third element of "serious impairment of body function." We agree with defendants.

"Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident." *McCormick*, 487 Mich at 202. "[C]ourts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. "[W]hile the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is, there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*. at 202-203. "[T]he statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *Id*. at 203. Thus, for example, testimony that a child could not use the school "play equipment," could no longer dress himself, and struggled to sleep and engage in physical activities for a three-to-four-month period is sufficient to establish a question of fact as to the third element of "serious impairment of body function." See *Piccione v Gillette*, 327 Mich App 16, 21-23; 932 NW2d 197 (2019).

In this case, SGM testified during her deposition that she was unable to wear her preferred clothes for about two months after the accident because some of her skin was bandaged. In particular, SGM had to wear pants, not skirts or dresses, as she desired. SGM also indicated that she was unable to "hang out with [her] friends as often" as she preferred during that time. However, these effects of the accident, while unfortunate, were only temporary. In our judgment, a two-month period of having her life affected in such a manner does not rise to the level of significance required by MCL 500.3135(5)(c), i.e., affecting SGM's general ability to lead her normal life. That is, while it is true that a two-month period in certain cases may be sufficient to satisfy MCL 500.3135(5)(c), see *Piccione*, 327 Mich App at 21, the mere fact that SGM had to temporarily wear pants and could no longer spend as much time with her friends as she preferred did not affect her "general ability" to lead her normal life.

Further, SGM has not identified any other evidence in the record showing that her impairment following the accident affected her ability to live her normal life. See *id*. She testified that at the time of her deposition, she was in school full-time, including "honors pre-calc." The clear implication of her testimony in this regard is that the accident did not affect her academic studies. Moreover, SGM testified that at the time of her deposition, she was employed by an "arts and craft workshop," with the implication of her testimony similarly that the accident did not affect her ability to be employed. Indeed, when asked whether "there [are] any things [she] can't do or that [she] avoid[s] because of [her] back or leg pain," SGM answered in the negative.

At most, the evidence suggests that SGM experienced some type of social effects from the marks on her legs after the accident, briefly testifying as follows during her deposition:

Q: Okay. Is that something that has caused you any problems in terms of people looking at your legs and saying -- or making remarks or saying anything about your legs?

A: Yes, it has.

Q: When did that occur?

A: Afterward when I had to be all bandaged up, I would get like remarks for it. And like now when you can still see the discoloration, people have mentioned it.

* * *

Q: Any other effect on your life that we haven't gone over?

A: Socially, it kind of affected me.

Q: In what way?

A: There's a security camera footage of what happened and that got out into my school, and people still made jokes about it and edits about it, and I still get talked to about it today.

Again, while we acknowledge that these are unfortunate side effects of the accident, especially the video camera footage, they do not rise to the level of affecting SGM's ability to live her normal life. There is nothing to indicate that SGM's social life or ability to positively interact with others suffered in the short or long term. In other words, there is nothing to indicate that SGM's post-accident social life was significantly different from her pre-accident social life. See *McCormick*, 487 Mich at 202. Rather, SGM merely explained that her "discoloration" is noticeable and that people still joke about, and reference, the accident itself. SGM did not testify, for example, that she was unable to maintain friendships or feel comfortable in school because of the commentary of others. Nor, contrary to plaintiff's implication on appeal, did SGM testify about "humiliation" or "embarrassment." Without any such testimony or other evidence in the record, there is an insufficient basis to conclude that plaintiff established a genuine issue of material fact with regard to the third element of "serious impairment of body function."

## B. PERMANENT SERIOUS DISFIGUREMENT

Next, the parties dispute whether plaintiff showed that SGM suffered a "permanent serious disfigurement" for the purposes of MCL 500.3135. According to defendants, "[t]he grainy photograph submitted by [SGM] does not establish serious or permanent scarring. . . . Any discoloration or disfigurement is not evident from this photograph, and it is the only proof [SGM] submitted in support of her serious, permanent disfigurement claim." According to plaintiff, on the other hand, "[t]he comparison of the non-scarred tissue and the scarred tissue on her leg shows

a lighter and pinkish hue to her skin tone as opposed to her normal skin tone and even a darker red scar above her knee that is clearly visible." We again agree with defendants.

> Under the plain language of MCL 500.3135(1), in order to meet the disfigurement threshold, a plaintiff must have a disfigurement that is both permanent and serious. To disfigure something is to "mar the appearance or beauty of," to "deform," or to "deface." *Random House Webster's College Dictionary* (1997). Hence, with regard to a person, a disfigurement is something that mars, deforms, or defaces the person's appearance. Further, the disfigurement is permanent if it will exist perpetually or is otherwise "long-lasting," and will be considered serious if it is "significant" or "not trifling." *Id*. Thus, a threshold disfigurement is a long-lasting and significant change that mars or deforms the injured person's appearance. [*Fisher*, 286 Mich App at 67.]

"The seriousness of a scar depends on its physical characteristics rather than its effect on a plaintiff's ability to live a normal life." *Minter v City of Grand Rapids*, 275 Mich App 220, 242-243; 739 NW2d 108 (2007) (MURRAY, J., *concurring in part and dissenting in part*), rev'd 480 Mich 1182 (2008).[4] "[A] plaintiff's embarrassment and sensitivity about her appearance are a subjective reaction to a condition that must be objectively judged by the trial court, and do not always create a question of fact." *Id*. at 243. Thus, for example, "a 13 millimeter scar above plaintiff's eyebrow that is only slightly lighter in color than plaintiff's skin tone" is not a "permanent serious disfigurement" under MCL 500.3135(1). *Id*.

In this case, the only evidence that plaintiff introduced in the trial court to show "permanent serious disfigurement" is a single, grainy photograph of SGM's leg that, upon close inspection, indicates that part of her shin is a different color than the remainder of her leg.[5] That photograph apparently was submitted to the trial court in black and white, rendering it even more difficult to identify whether and to what extent SGM's leg is scarred.[6] Moreover, the photograph is undated, although plaintiff represented in his January 3, 2024 response brief that the photograph is "current."

We conclude that the photograph does not reflect a "permanent serious disfigurement" for the purposes of MCL 500.3135. Even considering the colorized version of the photograph

---

[4] In *Minter*, a majority of this Court held that the plaintiff established a question of fact with regard to "permanent serious disfigurement," but our Supreme Court reversed "for the reasons stated in the Court of Appeals dissenting opinion." *Minter v City of Grand Rapids*, 480 Mich 1182, 1182 (2008). Thus, JUDGE MURRAY's opinion is controlling.

[5] Dr. Suleiman opined in his affidavit that the scarring was a "serious disfigurement." However, because we have a photograph of the scarring, the issue of whether it constitutes a "permanent serious disfigurement" for the purposes of MCL 500.3135 is a question of law for the court. See MCL 500.3135(2)(a).

[6] Exhibit Q of plaintiff's brief on appeal is a colorized version of the photograph submitted to the trial court. That photograph also is poor quality, although the pinkish hue of the scar is slightly more discernable than the black-and-white photograph.

presented to this Court by plaintiff, the scar merely appears to be a slightly different color than the surrounding skin. Further, while plaintiff has not provided any dimensions of the scar to identify its size, we note that the scar appears to be less than one inch wide and a few inches in length. Thus, given the evidence before us, the scar is not particularly unusual or egregious. In other words, the scar is not conspicuous. Accordingly, the scar does not rise to the level of "deforming" or defacing" SGM's appearance, see *Fisher*, 286 Mich App at 67, and there is no question of fact regarding whether SGM suffered a "permanent serious disfigurement."

## IV. CONCLUSION

The record does not establish a question of fact with regard to "serious impairment of body function" or "permanent serious disfigurement" for the purposes of MCL 500.3135. Therefore, we affirm.

/s/ Michael J. Riordan