*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NAHSUANTE S. SCARBER,

        Plaintiff-Appellant,

and

MAXIM MRI, LLC,

        Plaintiff,

v

DELVESTER D. ISSA,

        Defendant,

and

PHILIP EVAN ACCETTURA,

        Defendant-Appellee.

UNPUBLISHED
March 10, 2022

No. 356216
Oakland Circuit Court
LC No. 2019-176543-NF

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and CAMERON, JJ.

PER CURIAM.

Plaintiff, Nahsuante S. Scarber, appeals by right the trial court's grant of summary disposition in favor of defendant Philip Evan Accettura.[1] This matter arises out of injuries plaintiff allegedly sustained as a passenger in a motor vehicle accident, and scarring that resulted from

---

[1] The trial court's order also granted summary disposition in favor of Delvester D. Issa, but plaintiff and Issa subsequently reached a settlement, and Issa was dismissed with prejudice and is no longer a party to this matter.

efforts to surgically remedy those injuries. Because the trial court reached the correct outcome, we affirm.

## I. BACKGROUND

This case arises from a motor vehicle accident that occurred on May 21, 2017. Plaintiff, who was pregnant at the time, was a passenger in a vehicle driven by Issa and struck by another vehicle driven by Accettura. Officer Patrick McWilliams, who responded to the collision, testified that there was "minor" damage to both vehicles, and an ambulance was not called. Plaintiff initially indicated to the police that she was not injured. However, later that day, she complained of pain that, at the time, she attributed to her pregnancy. The next day, plaintiff attended a previously-scheduled obstetrician/gynecologist appointment. The doctor opined that the baby and plaintiff appeared normal, but advised plaintiff not to seek further medical examination because doing so might put the baby at risk. Following the birth of her baby in June 2017, plaintiff sought medical treatment for pain she was experiencing to her back, neck, and shoulder.

At the time of the accident, plaintiff had been working full-time as a waitress for a staffing agency, but she had been on maternity leave since September 2016.[2] At some point before the accident, plaintiff had applied for Social Security disability benefits because her feet were swelling, and she had carpal tunnel syndrome from braiding hair "way before" the accident. She also suffered from cellulitis on her feet at one point. Plaintiff testified that, otherwise, she never suffered any other injuries or accidents prior to the May 21, 2017, accident. However, she acknowledged that before the accident, she had reported back pain, but not shoulder pain, to her doctor.

The parties provided a wide variety of medical records. According to those records, plaintiff was seen by Star Pain Management LLC in June of 2017. The patient record states, "Patient complains of neck, lower back, right shoulder, right arm, right hip and right leg pain. Symptoms stem from MVA on 5/4/17." She was prescribed Norco, and she was given a disability certificate "for housework and driving." At a follow up appointment in July of 2017, the Star Pain Management doctor assessed plaintiff with some tenderness in her spine and some reduced range of motion. She was prescribed physical therapy and pain medications, and the report also indicates that "disability has been approved." Plaintiff attended physical therapy at Core Physical Therapy Corp for several months before discharging herself in October of 2017 because her "medical benefits [were] suspended by insurance." According to the records from Core Physical Therapy, plaintiff's pain, strength, and stiffness had improved by then, but only modestly.

---

[2] On appeal, plaintiff argues that she had been working as a valet before the accident. That is not supported by her deposition testimony, which was that she started working full-time as a valet in November 2019. Plaintiff also argues on appeal that her valet job required her to sprint to cars. That is also not supported by her deposition testimony, which was that she did not need to run for the job. Rather, the attorney conducting the deposition commented that *he* had a valet job at one point that had required *him* to run.

Meanwhile, in July of 2017, plaintiff began receiving treatment at Mercyland Health Services.[3] On July 26, 2017, she was seen by Dr. Allan Schwartz, who prescribed pain medications; plaintiff was given a disability certificate restricting her from employment, housework, and driving. On August 30, 2017, plaintiff was seen by Dr. Mustafa Shukr, who again prescribed pain medications; he also advised plaintiff to continue physical therapy, but he cleared her to return to work and restricted her from lifting more than 10 pounds. According to the patient record from that date, and according to Dr. Shukr's deposition testimony, he cleared plaintiff to return to work because "[t]here was some pain, but it wasn't debilitating." Plaintiff continued treating with Mercyland through February of 2019, being seen by a variety of different health professionals. She continued to receive disability certificates from Mercyland through November of 2018. Those certificates consistently restricted her from lifting more than 10 pounds, mostly specified that she should take breaks as needed every 2-3 hours, and intermittently imposed driving restrictions.

On November 11, 2017, plaintiff went to the emergency department of Ascension Providence Hospital, complaining of "several days of left lower extremity pain and edema" and reporting "that she had suffered a fall roughly two weeks ago and suffered an abrasion to her left knee." Treating physicians noted "marked erythema over her left lower extremity from below the knee extending to her foot." She was diagnosed as "most likely" having cellulitis," and she was discharged with an antibiotic. The discharge documentation from Ascension Providence does not mention plaintiff reporting any other complaints.

On January 4, 2018, plaintiff underwent several MRI studies conducted by Maxim MRI. According to the imaging report, her thoracic spine was normal, her cervical spine was normal other than "reversal of the mid lordotic curve," her lumbar spine was unremarkable but the imaging suggested "possible fibroid changes of the uterus," her brain was normal, and her right hip was only partially imaged but was otherwise unremarkable. However, the imaging of her right shoulder found a "partial thickness tear with intrasubstance and peritendon edema distal supraspinatus tendon at its attachment" and "mild AC joint degenerative damage without impingement of supraspinatus."

On December 5, 2018, plaintiff was referred by Mercyland to neurologist Dr. Stefan Pribil, who ordered further MRIs of plaintiff's cervical and lumbar regions performed. On December 12, 2018, plaintiff underwent more MRI studies conducted by M1 MRI. These studies revealed a number of bulging discs and some neural foraminal narrowing. At a follow-up appointment on January 9, 2019, Dr. Pribil described the neuro foraminal narrowing as "severe," noted that plaintiff's right arm appeared to have less muscle tone than her left arm, and noted that her right arm had decreased sensitivity to touch. He concluded, "[c]learly she has a cervical radiculopathy

---

[3] Defendant describes Mercyland as "infamous" but fails to explain why, point to any evidence in the record explaining why, or point to any fact of which we could take judicial notice explaining why. Defendant asserts that one of the treating doctors is in prison, but defendant likewise fails to provide record evidence in support of that assertion or explain how that doctor's imprisonment is relevant to the facts in this case. In any event, even if these assertions are true, defendant implicitly asks us to weigh evidence in a manner inappropriate to a summary disposition context.

to the right side." He recommended artificial disc replacement at "the C4-5 level where the neural foraminal herniation is the worst," with possible further intervention if necessary. Dr. Pribil performed the disc replacement surgery on February 21, 2019.

On July 12, 2019, plaintiff underwent an MRI of her right shoulder, performed by Gravity Imaging, which found no "evidence for rotator cuff or glenoid labral tear" or any other abnormal findings. On July 24, 2019, plaintiff returned to Dr. Pribil, reporting that she "ha[d] been doing great after the artificial disc replacement at the C4-5 level," but she was encountering further "severe pain in the neck and right arm." Dr. Pribil ordered further MRIs, which were performed on July 30, 2019, by Gravity Imaging. The prior artificial disc replacement limited the imaging of plaintiff's cervical spine, but otherwise her cervical spine appeared unremarkable. Imaging of plaintiff's lumbar spine revealed "mild degenerative spondylosis" at L4-L5 and L5-S1, and a small left foraminal disc herniation at L3-L4. On October 23, 2019, Dr. Pribil performed further surgery on plaintiff's spine. Following the two procedures, plaintiff was left with a visible scar on her neck and on her back.

In the meantime, plaintiff returned to working part-time as a waitress in September 2017. In October 2017, she obtained another part-time job as a food distributor handing out samples at a Sam's Club. Plaintiff quit her waitress job in April 2018, and she obtained a different waitressing job at approximately the same time, but she quit after a couple of months because her "injuries [were] getting too bad." Plaintiff also left her job at Sam's Club; her testimony is unclear, but seemingly she left that job in December 2018 or January 2019. She obtained a full-time job as a valet in November 2019, and she explained that she does not need to run at that job, and she is not either constantly sitting or standing.[4] Plaintiff testified that, as of the date of her deposition, she was unable to remain sitting or standing for very long, move her shoulder without pain, cook as much as she could before the accident, clean, exercise as much as she wants to, or start a business. She conceded that she had not run a business before the accident.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10). The trial court found "a factual dispute concerning the nature and extent of the Plaintiff's injuries," but held that plaintiff was unable to establish that her general ability to lead her normal life had been affected. In particular, the trial court found that all of plaintiff's restrictions were self-imposed, and "a comparison of Plaintiff's life before and after the May 2017 accident yields a pattern that has not changed." The trial court also concluded that plaintiff's scars did not constitute permanent serious disfigurement, because plaintiff had "not presented any documentary evidence to show that her injury had any physical characteristics. Rather, the alleged disfigurement resulted from her surgery to correct her alleged injuries." The trial court did not directly address defendants' arguments that

---

[4] As noted above, plaintiff's testimony establishes that she did not work as a valet before the accident.

plaintiff had failed to establish a causal nexus between the injury and plaintiff's injuries. The trial court granted summary disposition in favor of defendants,[5] and this appeal followed.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. "A party opposing summary disposition under MCR 2.116(C)(10) may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Walrath v Witzenmann USA, LLC*, 320 Mich App 125, 130; 904 NW2d 875 (2017) (quotation marks and citation omitted). However, the non-moving party need not be able to prove its case or resolve a question of fact to survive a motion for summary disposition. *Durant v Stahlin*, 375 Mich 628, 645-647; 135 NW2d 392 (1965) (SOURIS, J.); *Morales v Auto-Owners Ins Co*, 458 Mich 288, 304; 582 NW2d 776 (1998). When deciding a motion for summary disposition, the court may not assess credibility, weigh the evidence, or make factual findings; furthermore, "courts should be liberal in finding that a genuine issue of material fact does exist." *Lytle v Malady*, 458 Mich 153, 176-177; 579 NW2d 906 (1998). Because our review is de novo, we will affirm a correct result even if the trial court arrived at that result on the basis of incorrect reasoning. See *Michigan Gas & Elect Co v City of Dowagiac*, 278 Mich 522, 526; 270 NW 772 (1936).

## III. PRINCIPLES OF LAW

"Under Michigan's no-fault act, MCL 500.3101 *et seq.*, tort liability is limited." *Piccione v Gillette*, 327 Mich App 16, 19; 932 NW2d 197 (2019). "A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1).

MCL 500.3135(2)(a) provides:

> The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>
> (*i*) There is no factual dispute concerning the nature and extent of the person's injuries.

---

[5] As noted above, plaintiff and Issa subsequently entered into a settlement, and the parties stipulated to dismiss Issa as a party. Therefore, the singular "defendant" in this opinion will refer only to Accettura.

(*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement. However, for a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury.

"Serious impairment of a body function 'means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.' " *Piccione*, 327 Mich App at 20, quoting MCL 500.3135(5). "On its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517.

"[T]he determination whether a disfigurement constitutes permanent serious disfigurement is a question of law absent a genuine outcome-determinative factual dispute." *Kern v Blethen-Coluni*, 240 Mich App 333, 344; 612 NW2d 838 (2000). "Whether an injury amounts to a permanent serious disfigurement depends on its physical characteristics rather than its effect on the plaintiff's ability to live a normal life." *Kosack v Moore*, 144 Mich App 485, 491; 375 NW2d 742 (1985). "[W]hen determining whether a plaintiff has established a threshold disfigurement, courts must objectively examine the physical characteristics of the injury on a case-by-case basis and determine whether, in light of common knowledge and experience and considering the full spectrum of the injured person's life activities, the injury's physical characteristics significantly mar or deform the injured person's overall appearance." *Fisher v Blankenship*, 286 Mich App 54, 67; 777 NW2d 469 (2009).

## IV. SERIOUS IMPAIRMENT OF BODY FUNCTION

The trial court found that plaintiff's injuries did not affect her general ability to lead her normal life. We disagree. As explained in *Piccione*:

[A]n "impairment to an important body function affects a person's general ability to lead a normal life if it has an influence on some of the person's capacity to live in his or her normal manner of living. Because no two people are alike, the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is. . . . In other words, the inquiry is subjective. To show that the impaired person's ability to lead his or her normal life has been affected, we compare the person's life before and after the injury. Important to making this comparison is the fact that the statute merely requires that a person's general ability to lead his or her normal life has been affected, not destroyed. Therefore, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected. Additionally, the statute only requires that some of the

-6-

person's ability to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected. Lastly, as our Supreme Court explained in *McCormick*, [w]hile the Legislature required that a serious disfigurement be permanent, it did not impose the same restriction on a serious impairment of body function. Thus, there is no express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life. [*Piccione*, 327 Mich App at 20-21 (quotation marks and citations omitted).]

In *McCormick*, 487 Mich at 218-219, the Court concluded that the plaintiff showed that his impairment affected his general ability to lead his normal life because, for at least a month, he could not bear weight on his ankle, he underwent two surgeries, and his capacity to work was affected. In *Piccione*, 327 Mich App at 21-22, this Court similarly concluded that the injured child's general ability to lead his normal life was affected by his impairment because he was unable to go to school for two weeks, he was unable to use the play equipment when he returned, his parents had to help him go to the bathroom and dress after the accident, he needed help going up the stairs after the accident, his ability to sleep without pain was compromised, he no longer wanted to color, and he was no longer able to ride his bike, play soccer, or play with his scooter.

Plaintiff admitted that she had complained of neck and back pain before the accident, but there is no evidence she reported the same level or kind of pain. Indeed, the record appears to contain no medical records or other evidence suggesting that plaintiff was under any particular restrictions before the accident, or that she suffered from any conditions other than swelling in her feet, possibly cellulitis, and possibly carpal tunnel syndrome from braiding hair. As defendant notes, a doctor who saw her once a few months after the accident opined that plaintiff could return to work, although the doctor nevertheless restricted her from lifting more than 10 pounds. Nevertheless, the damage to plaintiff's spine was clearly objectively manifested. The disc bulges, herniations, and nerve compression from the neural foraminal narrowing would all tend to cause pain. Furthermore, it is highly unlikely that anyone would undergo spinal surgery unless they felt it was necessary. Likewise, the fact that plaintiff did not initially believe herself to be injured is of little significance, both due to the complicating factor of plaintiff's pregnancy and because it is common for some injuries not to be immediately apparent. Defendant appears to argue that some of plaintiff's medical treatment should be regarded with suspicion, but when evaluating a motion for summary disposition, making such credibility assessments is not permitted. *Lytle*, 458 Mich at 176. Plaintiff's pain is therefore not merely self-reported, and her limitations are not self-imposed.

We conclude that plaintiff established a genuine question of material fact whether her ability to live in her normal manner had been affected by her injuries. Plaintiff testified that she could no longer run or lift more than 25 pounds, and medical records show that for a lengthy period, she was restricted from lifting more than 10 pounds. She also testified that, before the accident, she could cook a full course meal and had even taken some culinary arts classes, whereas after the accident she could only cook a little and could no longer clean at all. Plaintiff indicated that she had previously engaged in baking and preparing gift boxes as a form of self-employment, and she was no longer able to do so. Viewing this evidence in the light most favorable to plaintiff, there is a genuine issue of material fact regarding whether her injuries affected her general ability

to lead her normal life. Therefore, the trial court erred in concluding as a matter of law that plaintiff's general ability to lead her normal, pre-accident life was unaffected or self-imposed.

## V. PERMANENT SERIOUS DISFIGUREMENT

The trial court also found that plaintiff failed to establish a permanent serious disfigurement because she had not presented any documentary evidence to show that her injuries had any physical characteristics and her alleged disfigurement had resulted from surgery to correct her alleged injuries. Although we disagree with the trial court's reasoning, the trial court arrived at the correct outcome.

We disagree with the trial court's conclusion that plaintiff's injuries had no physical characteristics. As discussed, the MRI of plaintiff's spine objectively revealed an injury that required surgery. Plaintiff provided photographs of her scars to the trial court.[6] The fact that the surgical scars are a secondary effect to correct the injury does not make the scars irrelevant or nonphysical. To the contrary, the objective evidence establishes that plaintiff has suffered a disfigurement. Furthermore, there is no evidence to suggest that the scars can be ameliorated, unlike *Kosack*, 144 Mich App at 491, in which this Court concluded that the plaintiff's scars were not permanent as a matter of law because the plaintiff's own testimony suggested that medical treatment could reduce the extent of the scarring. The evidence therefore establishes that plaintiff has suffered a permanent disfigurement as a result of her injuries. We discuss below whether those injuries were causally linked to the accident, but presuming a causal link between the accident and the injuries, the scars were equally causally linked.

However, on this record, we cannot find the scars to constitute a *serious* disfigurement. Whether the scars constitute a permanent serious disfigurement is a question of law, *Kern*, 240 Mich App at 344, so we must nevertheless resolve that question. One of the scars is on plaintiff's back, but the exact location is not apparent from the photographs provided. Furthermore, as a matter of "common knowledge and experience," *Fisher*, 286 Mich App at 67, backs are usually covered with clothing and facing away from people with whom one is interacting. There is no evidence or testimony to suggest that plaintiff is an exception to the norm in that respect. On the basis of the minimal evidence provided by plaintiff, it is therefore not possible to conclude that plaintiff's back scar is a permanent *serious* disfigurement.

The scar on plaintiff's neck presents a much closer question. In *Minter v City of Grand Rapids* (*Minter I*), 275 Mich App 220; 739 NW2d 108 (2007), a majority of this Court found a question of fact whether a 13 millimeter permanently visible scar on the plaintiff's eyebrow that prevented her from moving the eyebrow normally constituted permanent serious disfigurement. *Id*. at 223-224, 228-230 (DAVIS, J.), 231-233 (O'CONNELL, P.J., concurring). The dissenting judge

---

[6] It is not clear whether the color photographs provided on appeal were provided to the trial court, but even the grayscale photos in the lower court record file provided to us clearly show that the scars are visible. The electronic lower court file provided to us is only in grayscale, but that might be because of how the documents were scanned rather than reflective of how they were presented to the trial court. The photographs included in plaintiff's brief, which is very similar in form to plaintiff's brief in the trial court, are in color.

found the question close but concluded that the scar was not serious, and "a plaintiff's embarrassment and sensitivity about her appearance are a subjective reaction to a condition that must be objectively judged by the trial court." *Id*. at 242-243 (MURRAY, J, dissenting in part). Our Supreme Court peremptorily reversed as to that issue "for the reasons stated in the Court of Appeals dissenting opinion." *Minter v City of Grand Rapids* (*Minter II*), 480 Mich 1182, 1182; 747 NW2d 229 (2008). Because *Minter II* is capable of being understood, albeit by reference to another opinion, it is binding upon us. *Woodring v Phoenix*, 325 Mich App 108, 115; 923 NW2d 607 (2018). Another case has held that a visible three centimeter scar under a plaintiff's eye is not serious. *Nelson v Myers*, 146 Mich App 444, 446, 446 n 1; 381 NW2d 407 (1985).

As a matter of "common knowledge and experience," facial scars are—all other things being equal—generally more striking than scars elsewhere on the body. A scar on the front of a person's neck can be similarly conspicuous. However, the photographs provided by plaintiff are insufficient to evaluate the actual conspicuousness of the scars. Plaintiff has provided only one photograph of each scar. The photograph of the scar on plaintiff's back is an extreme close-up that yields no information about its size or location, nor does it yield any information about how visible the scar might be from a more "normal" perspective. The blurry photograph of the scar on plaintiff's neck is slightly less close-up, but it is not clear whether it depicts the front or the back of plaintiff's neck. It is also not apparent how visible the scar would be from the "normal" perspective of another person or in other lighting conditions, nor is it apparent whether the scar is merely discolored or also differently textured. Plaintiff's description of the scars as "large" is a subjective description, not an objective description.

We conclude that the photographs are sufficient to show that the scars have physical characteristics, contrary to the trial court's holding, but they are insufficient to demonstrate a permanent serious disfigurement. The trial court therefore ultimately reached the correct result.

## VI. CAUSATION

Defendant argues, in the alternative, that plaintiff has failed to establish that her injuries and scars were causally connected to the accident. Although the trial court did not reach this issue, defendant raised it below. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). This issue is therefore properly preserved for our review.

"In a negligence action, a plaintiff must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017) (quotations omitted). Defendant does not meaningfully dispute that, as a general matter, unsafe driving resulting in a vehicle accident can foreseeably cause a passenger in another vehicle to suffer permanent injuries and disfigurement. "Where an act is negligent, to render it the proximate cause, it is not necessary that the one committing it might have foreseen the particular consequence or injury, or the particular manner in which it occurred, if by the exercise of reasonable care it might have been anticipated that some injury might occur." *Baker v Mich Cent Ry Co*, 169 Mich 609, 618-619; 135 NW2d 937 (1912). To the

extent the damage to plaintiff's spine was factually caused by the accident, it was also legally caused by the accident.[7]

Defendant primarily argues that defendant cannot establish factual causation. We agree. To establish factual causation sufficient to overcome a motion for summary disposition, "the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner v Square D Co*, 445 Mich 153, 164-165; 516 NW2d 475 (1994). Proofs may be circumstantial and need not be airtight, but they must provide more than speculation, more than slight evidence, and more than mere plausibility. *Id*. at 165-167. Circumstantial evidence will be sufficient if it "establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Mulholland v DEC Int'l Corp*, 432 Mich 395, 415; 443 NW2d 340 (1989). There must be an explanation for why and how a particular act could have resulted in the particular injury. See *Skinner*, 445 Mich at 167 (inferential causal link shown between a boat explosion and a defectively leaking fuel pump where the boat operated properly previously, the engine started to "run rough" just before the explosion, expert testimony established that the engine symptoms were consistent with a leaking fuel pump rather than any other gasoline source); see also *Patrick v Turkelson*, 322 Mich App 595, 619-620; 913 NW2d 369 (2018) (inferential causal link shown between car accident and hearing loss where the plaintiff had normal hearing before the accident, was exposed to loud noise from air bags deploying, and suffered hearing loss immediately after the accident).

We do not agree with the entirety of defendant's argument. As noted, plaintiff's previous reports of pain and application for Social Security disability were clearly for unrelated reasons, and no medical evidence has been provided showing that defendant had any relevant physical disability or impairment before the accident. Therefore, the evidence is sufficient to permit the trier of fact to reasonably conclude that plaintiff's injuries were not pre-existing before the accident. The fact that plaintiff did not believe herself to be injured at the scene of the accident is not dispositive, and plaintiff's pregnancy at the time of the accident is a significant complicating factor. The pain plaintiff suffered later in the day could suggest a logical sequence of cause and effect. *Patrick*, 322 Mich App at 620. Notwithstanding the characterization of spinal herniations as a "degenerative" condition, a progressive deterioration may be causally linked to an accident where at least some symptoms began shortly after that accident. *Wilkinson v Lee*, 463 Mich 388, 394; 617 NW2d 305 (2000). The evidence, if viewed in the light most favorable to plaintiff,[8] is sufficient to permit the trier of fact to reasonably conclude that plaintiff's injuries were not pre-existing before the accident and does not exclude the possibility that her injuries were caused by the accident.

---

[7] This causal link, if any, would also extend to plaintiff's scars.

[8] We recognize that defendant's expert accident reconstructionist provided evidence affirmatively tending to show that the accident could not have caused plaintiff's injuries, but for purposes of summary disposition, we must view the evidence in the light most favorable to plaintiff, and we may not weigh the evidence or make factual findings. *Lytle*, 458 Mich at 176. We therefore limit our consideration to the existence (or lack) of evidence in support of causation, not against it.

-10-

However, to survive a motion for summary disposition, the evidence must demonstrate that plaintiff's claim is more than merely plausible. *Skinner*, 445 Mich at 164-167. This means that one particular conclusion must more probable than any other conclusions, rather than merely plausible. *Id*. As defendant observes, a temporal relationship is insufficient, by itself, to establish the requisite causal nexus. *Lowery v Enbridge Energy Ltd Partnership*, 500 Mich 1034, 1034-1035; 898 NW2d 906 (2017). Critically, in *Skinner*, *Patrick*, and *Wilkinson*, experts expressly provided explanations of how and why the injury at issue would flow from the act at issue. As noted, plaintiff's pregnancy is a significant confounding factor that made immediate detection of possible symptoms impossible, through no fault of, or attribution to, plaintiff. However, although that should not be held against plaintiff, it likewise does not work in her favor, because the courts nevertheless may not guess or pretend to have medical expertise of our own. The record indicates that the accident was not so severe that we should presume the temporal proximity was no coincidence. It was therefore incumbent upon plaintiff to provide *some* kind of expert testimony or opinion to "fill in the gap" and elevate the causal link between the accident and her injuries beyond mere plausibility. Plaintiff contends that some of her treating physicians opined that her injuries were caused by the accident. However, the treating physicians were clearly only reporting what plaintiff told them and offered no explanation for how the injuries could have been caused by the accident. Thus, plaintiff has not provided the necessary mechanism of action, expert opinion, or other basis for elevating the link between the accident and her injuries from plausible to probable.

We therefore conclude that the trial court reached the correct outcome. Because the evidence provided by plaintiff was insufficient to establish more than a merely plausible causal link between the accident and her injuries, defendants were entitled to summary disposition in their favor.

Affirmed. Although defendant is the prevailing party, in light of the serious flaws in the trial court's reasoning, we direct that the parties shall bear their own costs on appeal. MCR 7.219(A).

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Thomas C. Cameron